## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BROOKS AUTOMOTIVE GROUP, INC.   :
formerly known as BROOKS              :
OLDSMOBILE-CADILLAC-              :
GMC TRUCK, INC. and                :
B.L.P. REAL ESTATE, LLC,            :
                                  :
               Plaintiff,         :　　CIVIL NO. _____
                                  :
             v.                       :
                                  :
GENERAL MOTORS LLC,             :
                                  :　　JURY TRIAL DEMANDED
                 Defendant.       :

## COMPLAINT

NOW COME BROOKS AUTOMOTIVE GROUP, INC. formerly known as BROOKS OLDSMOBILE-CADILLAC-GMC TRUCK, INC. ("Brooks") and B.L.P. REAL ESTATE, LLC ("BLP Real Estate"), by and through their attorneys, Dilworth Paxson LLP, and file the within Complaint against General Motors LLC ("GM"), based upon the following averments:

## PARTIES

1.　　Plaintiff Brooks is a Pennsylvania corporation which at all times relevant to this litigation was engaged in business as a retail automobile dealership with a principal place of business located at 2401 Memorial Boulevard, Connellsville, Pennsylvania 15425.

2.     Plaintiff BLP Real Estate is a Pennsylvania limited liability company which owned the property located at 2401 Memorial Boulevard, Connellsville, Pennsylvania 15425.

3.     Defendant GM is a Delaware limited liability company engaged in business as a manufacturer and distributor of new automobiles, trucks and related products, with corporate offices located at 100 GM Renaissance Center, Detroit, Michigan 48265-1000.  GM is presently licensed by the Commonwealth of Pennsylvania as a manufacturer and distributor of new Cadillac, Buick, GMC Truck and Chevrolet vehicles and related products.

## SUBSTANCE OF THE ACTION

4.     Plaintiffs bring this action against GM for its unlawful and improper conduct in its unreasonable and untimely denial of Brooks proposed sale of its Buick and GMC Truck dealership assets to Casey Harper and C. Harper Holdings, Inc. d/b/a as C. Harper Autogroup  ("Harper Autogroup") and its subsequent unreasonable delay in considering Brooks' revised sales proposal. GM's actions were in violation of multiple provisions of the Pennsylvania Board of Vehicles Act (63 P.S. § 818.1 *et. seq.*); in breach of GM's duties of good faith and fair dealing under its dealer agreement with Brooks; and constitute tortious interference with the Asset Purchase agreement between John Brooks, Brooks, Casey Harper and Harper Autogroup.  As a direct consequence of GM's

2

120187280_4

unlawful acts and omissions, Plaintiffs have suffered monetary damages in excess of $1.3 million dollars. Plaintiffs seek monetary, compensatory and punitive damages against GM for its unlawful conduct.

## JURISDICTION

5.     This Court has diversity jurisdiction over the matters now brought before it pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## VENUE

6.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391, in that it is where a substantial part of the events giving rise to Brooks' claims occurred and it is where the Brooks' Buick and GMC Trucks dealerships were located at the time of the events in question.

## FACTUAL BACKGROUND

7.     Brooks' president and dealer principal, John Brooks, grew up in Bluefield, West Virginia. Upon graduation from high school, John Brooks enlisted in the United States Army where he served as a decorated combat medic in the Vietnam War.

120187280_4

8.     After the war, John Brooks returned to West Virginia and subsequently owned and operated Chevrolet and Cadillac dealerships in Morgantown, West Virginia.

9.     In 1985, GM contacted John Brooks and solicited him to open Oldsmobile and Cadillac dealerships in Connellsville, Pennsylvania.   John Brooks accepted GM's invitation and opened GM Oldsmobile and Cadillac dealerships at 2401 Memorial Boulevard in Connellsville.

10.     In 1996, John Brooks, through the corporate entity known as Brooks Oldsmobile-Cadillac-GMC Truck, Inc. acquired the GM Pontiac, Buick and GMC Truck line-makes.

11.     In order to accommodate these additional franchises and meet GM's facility requirements, John Brooks moved his operations and dealership facilities from 2401 Memorial Boulevard to 1044 University Drive in Connellsville, Pennsylvania.

12.     In 2006, John Brooks moved his franchises back to 2401 Memorial Boulevard into a newly constructed dealership facility that was then required by GM.

13.     In 2009, at GM's direction, Brooks remodeled its dealership facility at 2401 Memorial Boulevard in Connellsville to meet all of GM's then-existing

branding and operational facility requirements and to participate in GM's Essential Branding Elements ("EBE") program. Brooks continued to operate in this remodeled facility until September, 2017. (Attached as Exhibit "A" is a picture of the Brooks' facility at 2401 Memorial Boulevard in Connellsville as it existed in September 2017.)

14.    On June 1, 2009, without prior notice to Brooks, GM's predecessor, General Motors Corporation filed for bankruptcy.

15.    As part of the General Motors Corporation bankruptcy, GM elected to substantially reduce the number of its dealership franchises by shutting down its Pontiac, Saturn and Hummer line makes, selling its Saab line make and not assuming existing dealer agreements for a large number of Cadillac dealers.

16.    Thus, GM shut down its Pontiac line make and refused to assume Brooks' Cadillac dealer franchise agreement. Several years prior to the bankruptcy, in April of 2004, GM shut down its Oldsmobile line make.

17.    The aforementioned decisions made by GM resulted in Brooks' loss of its Oldsmobile, Pontiac and Cadillac franchises.

18.    Accordingly, beginning in 2010 and continuing thereafter, Brooks was left with only its Buick and GMC Truck franchises to operate from its recently constructed and newly remodeled Memorial Boulevard facility.

120187280_4

19.    In June of 2015, Brooks contacted GM and requested that it be permitted to add a Chevrolet franchise at its Memorial Boulevard facility.

20.    GM rejected Brooks' request claiming that there was insufficient market demand in Connellsville to support a new Chevrolet dealership, even though Chevrolet's biggest domestic competitor – Ford Motor Company ("Ford") was operating an adjacent Ford dealership that sold between 500-600 new Ford vehicles in 2015-2016.

21.    On July 23, 2015, Brooks Oldsmobile-Cadillac-GMC Truck, Inc. amended its Articles of Incorporation and changed its name to Brooks Automotive, Inc.

22.    During the same 2015-2016 time period, GM, through its captive finance company – Ally Bank, materially changed the floor plan terms on Brooks' loaner vehicles.

23.    Concurrently, and as noted above, GM was promoting its EBE program through which GM represented that Brooks could finance its 2009 remodeling construction costs at its Memorial Boulevard facility.    Through EBE, GM was offering to pay and/or credit its dealers $500 per each new GM vehicle ordered by and delivered to an EBE compliant dealer.    EBE compliance included a remodeled facility that met GM's then existing requirements.    Brooks

120187280_4

remodeled its Memorial Boulevard facility to become EBE compliant and to become eligible for the above-described EBE payments.

24.     However, GM did not fairly allocate to Brooks a sufficient number of "high demand/"high-selling" vehicles, thereby negatively impacting Brooks' ability to order  and sell more vehicles under GM's "turn and earn" allocation system.  By the end of 2015, Brooks' allocation of GM vehicles had diminished by approximately $1.8 million and its EBE payment money had been reduced by approximately forty percent (40%).

25.     Notwithstanding John Brooks' 30-year business relationship with GM, GM's acts and omissions had the cumulative effect of forcing Brooks into an unsustainable financial condition in which it would be forced to sell its GM franchise dealerships.

26.     On August 22, 2016, John Brooks met with GM representatives Regional Director – Regis Buckley, II ("Buckley"), Buick/GMC Truck Zone Manager – Steven Burns and Buick/GMC Truck Dealer Rep – Michael Lewis, who told John Brooks that he needed to "quit writing letters" requesting the addition of a Chevrolet franchise at Brooks' Memorial Boulevard facility because GM was not going to approve any such request.    The GM representatives also told John Brooks that he could sell his Buick and GMC Trucks franchise assets separately to rectify Brooks' financial condition.

120187280_4

A.    **Proposed Sale of Brooks' Buick and GMC Trucks assets.**

27.    Based upon GM's statements and representations at the August 2016 meeting, John Brooks began exploring the potential sale of the Brooks' Buick and GMC Trucks dealership assets to potential buyers.

28.    Brooks subsequently began negotiations with Casey Harper, another GM dealer principal operating in Belle Vernon, Pennsylvania through the entity known as C. Harper Holdings, Inc. d/b/a Harper Autogroup ("Harper Autogroup").  At the time, Harper Autogroup owned and operated several GM dealership line-makes, including Chevrolet, Buick and Cadillac at a large campus facility located at 100 Harper Drive, Route 51, Belle Vernon, Pennsylvania (the "Harper Autoplex").

29.    In the fall of 2016, John Brooks and Casey Harper came to an agreement wherein Harper Autogroup would purchase the Brooks' Buick and GMC Truck dealership franchise assets.  As part of the purchase, Harper Autogroup planned to effectively close/consolidate the Brooks' Buick franchise with its existing Buick franchise in Belle Vernon and relocate the GMC Truck franchise to the Harper Autoplex.

30.    After closing on the sale of the dealership assets to Harper Autogroup, John Brooks intended to sell his dealership facility in Connellsville

8

120187280_4

to an unrelated third-party. At the time, John Brooks had a $1.3 million offer for the sale of the Brooks' Memorial Boulevard dealership facility.

31.    On November 17, 2016, John Brooks, Brooks, Casey Harper and Harper Autogroup entered into a written Asset Purchase Agreement (copy attached hereto as Exhibit "B") (the "November 2016 APA"). Harper Autogroup agreed to purchase all of Brooks' new vehicles and new parts inventory. In addition, Harper Autogroup agreed to purchase the goodwill value of the Brooks' Buick and GMC Trucks dealership franchises for a total purchase price of $750,000.

32.    As required by Brooks' dealer franchise agreement with GM, closing on the sale was conditioned upon GM's approval of Casey Harper and Harper Autogroup, and GM's approval of the relocation of the GMC Truck dealership to the Harper Autoplex.

33.    Brooks notified GM of the proposed sale to Harper Autogroup and submitted the November 2016 APA to GM for approval on or about November 18-19, 2016.

34.    Per GM's request, Brooks subsequently submitted a dated copy of the APA on December 15, 2016 and all required forms with respect to GM's

120187280_4

consideration of the proposed sale to Harper Autogroup on January 9 and 12, 2017.

35.    On January 27, 2017, GM advised Brooks that no additional information was needed from Brooks relative to its consideration of the proposed sale to the Harper Autogroup.

36.    Casey Harper and Harper Autogroup initiated their application process by notifying GM of the proposed asset sale on December 15, 2016.

37.    Casey Harper and Harper Autogroup submitted and completed the initial GM Questionnaire application form on January 5, 2017 via facsimile to GM's designated representative – Wannetta Perkins-Hill ("Perkins-Hill"). (A copy of the initial Questionnaire From and facsimile to GM dated January 5, 2017 is attached hereto as part of Exhibit "C".)

38.    GM responded by providing Casey Harper with a candidate user name and password to access the GM Global Connect System on January 12, 2017.

39.    On January 20, 2017, Harper Autogroup notified GM that it had completed all of the electronic application forms up to the pro forma balance sheet and was waiting for GM to provide it with the capital requirements necessary to complete the pro forma balance sheet.

120187280_4

40.     Over the course of the next several weeks, GM made multiple requests to Casey Harper and/or Harper Autogroup for additional information relative to GM's application and approval process, including a criminal background check of its existing dealer principal, Casey Harper.  All requested information was provided to GM.

41.     Many of these requests involved information that GM had and/or should have had in its possession as Harper Autogroup was an existing GM Chevrolet, Buick and Cadillac dealer and Casey Harper was the dealer principal for each of these GM franchises.  Similarly, all of Harper Autogroup's historical financial and performance information was known and/or readily accessible to GM.

42.     During this same period, John Brooks contacted GM on multiple occasions to inquire as to the status of GM's approval process.  John Brooks advised GM that as word of the proposed sale had become known, he was losing customers and key employees, and had little inventory to sell.  Thus, his monthly operating losses were mounting significantly.

**B.    GM's Denial of the November 2017 APA.**

43.     On April 19, 2017, GM issued a letter to John Brooks and Brooks, with copies to Harper Autogroup denying the proposed sale as represented in the

11

120187280_4

November 2016 APA ("April 19th denial letter").  (A true and correct copy of GM's April 19th denial letter is attached hereto as Exhibit "D".)

44.    In its April 19th denial letter, GM set forth the specific reasons on which it allegedly based its decision to deny the proposed sale.

45.    More particularly, GM stated that it had analyzed the proposal and its impact on the Pittsburgh area GMC Truck dealer network and found that it was "not acceptable to GM".  GM further represented that the proposal was "not in the best interest of GM's customers, the GMC brand, or the GMC dealer network" based upon the following factors relating to the proposed relocation of the Brooks' GMC Truck franchise to the Harper Autoplex:

    (a)    GM was allegedly concerned that the proposed relocation "may negatively" impact the five (5) existing Pittsburgh GMC Truck dealers' ability to achieve a reasonable rate of return on their dealership investments.

    (b)    GM was allegedly concerned about the declining population in and around Pittsburgh.

    (c)    GM stated that the existing GMC Truck dealerships were providing adequate competition as reflected by performance in the GMC Truck Retail Registration Index.

12

(d)   GM stated that the proposed relocation would have a negative impact on the existing GMC Truck dealer network because (i) the proposed relocation would not provide for exclusive representation of GMC Truck at the Harper Autoplex; (ii) the proposed relocation would result in the addition of a GMC Truck dealer point into the Pittsburgh Multi Dealer Area ("MDA"); and (iii) the proposed relocation would likely injure the existing GMC Truck customers and dealer network by increasing the distance customers would have to travel for GMC Truck sales and service.

(e)   GM was also allegedly concerned that Harper Autogroup's proposed forecast of GMC Truck sales was too high.

46.   On June 6, 2017, Casey Harper and Harper Autogroup, through their attorneys – James Davis, Esquire, requested that GM reconsider its decision to deny the proposed sale based upon their GM dealership history of exemplary performance and other information that contradicted GM's reasoning as set forth in the April 19th denial letter.

47.    GM responded by letter dated June 14, 2017, and reiterated that GM did not object to the proposed buyer – Harper Autogroup, but only to the proposed relocation of the Brooks' GMC Truck dealership to the Harper Autoplex in Belle Vernon.  (A true and correct copy of GM's letter of June 14, 2017 is attached hereto has Exhibit "E".)

48.    Although they vehemently disagreed with GM's decision, given GM's June 14th response and Brooks' continuing, ongoing and increasing operating losses, John Brooks and Casey Harper agreed to enter into a revised agreement for the sale of the Brooks' Buick and GMC Truck dealership assets.

49.    On June 27, 2017, John Brooks, Brooks, Casey Harper and Harper Autogroup entered into a new and revised Asset Purchase Agreement for the sale of the Brooks dealership assets (the "June 2017 APA").  (A true and correct copy of the June 2017 APA is attached hereto as Exhibit "F".)

50.    The substantive terms of the November 2016 APA and the June 2017 AP were essentially identical with two material exceptions: (i) the June 2017 APA no longer contemplated the relocation of the Brooks' dealership assets to the Harper Autoplex; and (ii) the purchase price for the goodwill value of the Brooks' Buick and GMC Truck dealerships was reduced from $750,000 to $600,000.

14

120187280_4

51.     In order to come to an agreement on the June 2017 APA, BLP Real Estate, a limited liability company which held legal title to the Memorial Boulevard Facility and the property on which it sits (hereinafter the "Memorial Boulevard Property"), entered into a Sales Agreement for the sale of the Memorial Boulevard Property to Casey Harper and C. Harper Holdings, Inc. and/or its successors and assigns ("Harper Holdings") (the "Real Estate Sales Agreement").  (A true and correct copy of the Real Estate Sales Agreement is attached hereto as Exhibit "G").

52.     Through the Real Estate Sales Agreement, BLP Real Estate agreed to sell the Memorial Boulevard Property to Harper Holdings.  Upon closing, it was intended that Harper Holdings would lease the Memorial Boulevard Property to Harper Autogroup so it could operate the Buick and GMC Truck dealerships at their then existing location.  The purchase price to be paid for the Memorial Boulevard Property was One Million Dollars ($1,000,000.00).

53.     In order to move forward with the June 2017 APA, Brooks and Harper Autogroup once again sought GM's approval.

54.     The June 2017 APA was forwarded to GM on the date it was signed – June 27, 2017.

120187280_4

55.    On July 11, 2017, GM, through its designated representative –
Perkins-Hill, emailed the required forms to Brooks for signature on behalf of
Brooks and Harper Autogroup.  The forms were signed and returned to GM on
the same day – July 11, 2017.

56.    On July 12, 2017, John Brooks contacted Perkins-Hill and was
advised that GM was in receipt of the forms but that Casey Harper and Harper
Autogroup would have to re-submit all of the other GM application forms,
including a second criminal background check authorization for Casey Harper,
financials and forecasts as though no prior proposal had ever been submitted.
Perkins-Hill told John Brooks that the process could take up to another 90 days.

57.    John Brooks again contacted GM's Regional Director for the
Northeast Region –Buckley and requested that the process be expedited in view
of the fact that Casey Harper was an existing dealer who had just recently
submitted the same information to the apparent satisfaction of GM.   John
Brooks reiterated to GM his concerns about the increasing operating losses
being caused by GM's delays.

58.    Through July and August, John Brooks continued to press GM for a
decision explaining that the delay was unreasonable in view of the fact that
through its June 14th letter, GM had effectively stated that Harper was qualified
and approvable and that the June 2017 APA no longer contemplated a relocation

16

of the Brooks' Buick and GMC Truck dealerships to the Harper Autoplex. Instead, the dealerships would continue to operate at the Memorial Boulevard Property.

59.    Finally, on September 5, 2017, 70 days after the June 2017 APA was submitted to it, GM approved the revised dealership sales proposal.

60.    On October 23, 2017, Brooks closed on the sale of its Buick and GMC Truck dealership assets to C. Harper Buick – GMC Inc. as the assignee of Harper Autogroup.  BLP Real Estate also closed on the sale of the Memorial Boulevard Property to Harper Holdings.

## NEGATIVE IMPACT ON JOHN BROOKS, BROOKS AND BLP REAL ESTATE

61.    Beginning with the August 2016 meeting, John Brooks advised GM through its regional director – Buckley, that it was financially untenable for Brooks to continue to operate its Buick and GMC Truck franchises at the Memorial Boulevard Property without the addition of the Chevrolet line-make.

62.    GM refused John Brooks' request and essentially told him to sell his franchises.

63.    John Brooks then sought out potential buyers and entered into negotiations with Casey Harper, an existing GM Buick, Cadillac and Chevrolet dealer with an exemplary performance record.

120187280_4

64.     When presented with the November 2016 APA, GM materially delayed its processing of Brooks' request for approval of Harper's application and treated Casey Harper and Harper Autogroup as unknown parties.

65.     More particularly, GM took 141 days from its receipt of the November 2016 APA from Brooks and 104 days from its receipt of the initial application forms from Casey Harper and Harper Autogroup to issue its April 19, 2017 denial letter.

66.     In addition, the alleged reasons for denial set forth in GM's April 19th denial letter were unreasonable, arbitrary and capricious.

67.     Contrary to GM's statements in its April 19th denial letter, the proposed relocation of the Brooks' GMC Truck dealership to the Harper Autoplex was within the Brooks' then assigned area of responsibility under Brooks' dealer franchise agreement with GM and would not have negatively impacted the GM's existing dealer network and/or its customers.

68.     A relocation is by definition, a change in the location of a dealership.  Thus, every relocation results in some consumers being somewhat inconvenienced by the move, while others will be closer to the new site and therefore become beneficiaries of the move. The appropriate question for GM's consideration was whether the proposed relocation negatively impacted a

120187280_4

materially greater number of consumers than it benefited; and/or stated another way, whether the relocation resulted in a material inconvenience to the average consumer.

69.   GM failed to present any market analysis or study to Brooks or Harper Autogroup to justify its denial.  Upon information and belief, Brooks believes that no independent market study was ever performed by or on behalf of GM prior to issuance of the April 19th denial letter.

70.   The proposed sale to Harper Autogroup through the November 2016 APA would not have changed the total number of GMC Truck dealers in the Pittsburgh market area, and would have in fact reduced the total number of Buick dealers in the Pittsburgh market area.

71.   Thus, GM offered no evidence to support its conclusion that the relocation of Brooks' GM Truck dealership from Connellsville to Belle Vernon would have negatively impacted the other five (5) existing GMC Truck dealers' ability to earn a reasonable rate of return on their dealership investments.

72.   A general reference to the declining population in and around Pittsburgh was completely inadequate to support GM's April 19th denial letter without a market study that would have included a detailed examination and

complete market study of the population trends in and around Connellsville, Belle Vernon and the other areas within the relevant market area.

73.    Similarly, GM's reliance on its own geographically defined MDA was misplaced, arbitrary and capricious.  As noted above, the proposed sale to Harper Autogroup would not have increased the total number of GMC Truck dealers in the Pittsburgh metro market.  GM created the geographical boundaries of the Pittsburgh MDA.  Thus, if Connellsville was not within the MDA, GM could have easily excluded Belle Vernon from it.  In this regard, GM could have simply re-drawn or modified its MDA geographical boundary lines to exclude Belle Vernon.  More importantly, the MDA is an artificial boundary created by GM in its arbitrary discretion.  It does not impact the practical reality that there were six (6) GMC Truck dealers competing in the Pittsburgh market area before the proposed sale to Harper Autogroup and that there would have been 6 GMC Truck dealers competing in the Pittsburgh market area after closing on the proposed sale to the Harper Autogroup had GM approved the November 2016 APA.  In addition, the number of Buick dealers competing in the Pittsburgh market area would have been reduced.

74.    GM's reliance on the fact that GMC Truck would not have been located in an exclusive facility is not relevant or appropriate to GM's denial of the proposed sale.  Brooks' GMC Truck dealership was not operated in an

20

exclusive facility and other Pittsburgh area GMC Truck dealers do not operate in exclusive facilities. Pennsylvania law also prohibits GM from insisting on exclusive dealer facilities that cannot be supported by existing market conditions or justified by business considerations. *See* 63 P.S. § 818.12(a)(6).

75.    Finally, GM's attempted reliance on the Harper Autogroup's forecast of sales as being "too-high" is absurd, arbitrary and capricious without a full and complete market study. Had GM advised Harper Autogroup that its forecast was "too high," it could have simply amended and reduced it. Moreover, upon information and belief, Harper Autogroup's forecast was generated in large part by the information provided to it by GM.

## PLAINTIFF'S DAMAGES

76.    As  a  direct  and  consequential  result  of  GM's  improper  and unlawful acts and omissions, Plaintiffs have suffered the following monetary damages:

(a)    Brooks lost $150,000 on the sale of the goodwill (blue sky) value of its Buick and GMC Truck dealerships to Harper Autogroup;

(b)    Brooks lost in excess of $850,000 as a direct result of GM's actions in denying the proposed sale to Harper Autogroup

120187280_4

through the November 2016 APA and its further delay in processing the June 2017 APA; and

(c)    BLP Real Estate lost $300,000 on the sale of the Memorial Boulevard Property.

## PENNSYLVANIA BOARD OF VEHICLES ACT

77.    The Pennsylvania Board of Vehicles Act, 63 P.S. § 818.1 *et. seq.*, (hereinafter the "BVA") was enacted to level the playing field and regulate the relationship between vehicle manufacturers and dealers.

78.    Section 29 of the BVA, expressly provides that "any person" who is or may be injured by a violation of a provision of the BVA, may bring an action for damages and equitable relief in any court of competent jurisdiction. 63 P.S. § 818.29.

79.    Section 12(b)(5) of the Pennsylvania Board of Vehicles Act (63 P.S. § 818.12(b)(5)) makes it unlawful for any manufacturer and/or distributor to fail to respond in writing to any request for consent to the sale of a franchise within sixty (60) days of receipt of a written request, on the forms, if any, generally utilized by the manufacturer or distributor for such purposes and containing the information required. 63 P.S. § 818.12(b)(5).

120187280_4

80.    Although Section 12(b)(5) of the Act provides that this time period may be extended by an additional 15 days if supplemental information is requested in a timely manner,  the statute expressly  provides that in "[n]o event shall the total time period for approval exceed 75 days from the date of the [manufacturer's] receipt of the initial forms." 63 P.S. § 818.12(b)(5).

81.    Section 12(b)(3) of the BVA provides that it shall be unlawful for a manufacturer to "unreasonably withhold consent to the sale … of the franchise to a qualified buyer capable of being licensed as a new vehicle dealer "who meets the manufacturer's or distributor's reasonable requirements for appointment as dealer." 63 P.S. § 818.12(b)(3).

82.    The terms "unreasonable" or "reasonable" as utilized by the BVA have been interpreted by Pennsylvania courts to mean that the manufacturer must act in good faith and in a commercially reasonable and honest manner with respect to the transaction at issue.  Decisions that are outcome driven and/or based on contrived reasons are unreasonable and unlawful.

83.    Thus, Section 12(b)(5) of the BVA prohibits a manufacturer from denying a request for approval of a dealer's sale of its dealership assets based upon contrived, manipulated and/or unfounded reasons that are not made in good faith.

120187280_4

84.     Section 11(a) of the BVA requires that a dealer serve a written demand for mediation before or contemporaneous with the timing of the filing of any complaint or legal action. 63 P.S. § 818.11(a).

85.     In this case, Brooks served a written demand for mediation upon GM on June 13, 2018.  (A true and correct copy of Brooks' letter is attached hereto as Exhibit "H".)  Mediation has not been conducted as of the date of the filing of this action.

## COUNT I
### (Violation of Section 12(b)(5) of the BVA)

86.     Plaintiffs hereby incorporate by reference the averments contained in Paragraphs 1 through 85 of the Complaint, *supra*, as if each and all said averments were fully set forth herein.

87.     Section 12(b)(5) of the Pennsylvania Board of Vehicles Act (63 P.S. § 818.12(b)(5)) makes it unlawful for GM to fail to respond in writing to any request for consent to the sale of a franchise within sixty (60) days of receipt of a written request, on the forms, if any, generally utilized by it for such purposes and containing the information required. 63 P.S. § 818.12(b)(5).

88.     Although Section 12(b)(5) of the Act provides that this time period may be extended by an additional 15 days if supplemental information is requested in a timely manner, it expressly states that in no event shall the time

24

120187280_4

period for approval exceed 75 days from GM's receipt of the initial application forms.  63 P.S. § 818.12(b)(5).

89.     Section 12(b)(5) of the Act further provides, in relevant part, that a failure by GM to respond within the time periods set forth, therein, *shall be* deemed to be approval of the request.  63 P.S. § 818.12(b)(5).

90.     Here, Brooks submitted the November 2016 APA to GM on or about November 18-19, 2016, and provided all forms required by GM by no later than January 12, 2017.

91.     Casey Harper and Harper Autogroup submitted and GM received the initial application questionnaire form on January 5, 2017.

92.     Casey Harper and Harper Autogroup subsequently submitted additional forms and information pursuant to GM's requests.

93.     Thus, under Section 12(b)(5), GM had until March 21, 2017 (75 days from the date of its receipt of the initial forms from Casey Harper and Harper Autogroup on January 5, 2017) to approve or deny the proposed sale as contemplated by the November 2016 APA.

94.     GM did not act on the proposed sale until it issued its April 19th denial letter on April 19, 2017.

120187280_4

95.    GM's April 19th denial letter was at least twenty-nine (29) days late under the requirements of the BVA, untimely and in violation of Section 12(b)(5) of the Act.

96.    Brooks and BLP Real Estate have each suffered monetary damages in excess of $75,000 as a result of GM's violation of Section 12(b)(5) of the BVA.

WHEREFORE, Plaintiffs demand that judgments be entered in their favor against GM in an amounts in excess of $75,000, together with interest and costs.

## COUNT II
### (Violation of Section 12(b)(3) of the BVA)

97.    Plaintiffs hereby incorporate by reference the averments contained in Paragraphs 1 through 96 of the Complaint, *supra*, as if each and all said averments were fully set forth herein.

98.    Section 12(b)(3) of the Act makes it unlawful for GM to unreasonably withhold consent to the sale of the Brooks' Buick and GMC Trucks franchises to a qualified buyer capable of being licensed in the Commonwealth of Pennsylvania, who meets the reasonable requirements of GM. 63 P.S. § 818.12(b)(3).

120187280_4

99.    At all times relevant to the instant claims, Harper Autogroup was a qualified buyer capable of being licensed as a new GMC Truck and Buick dealer in the Commonwealth of Pennsylvania.

100.    Casey Harper and Harper Autogroup, along with the Harper Autoplex, met all of Defendants' reasonable requirements for owning and/or operating the franchises at issue.

101.    GM's April 19th denial letter was an unreasonable denial of the proposed sale of the Brooks Buick and GMC Truck dealership assets to Harper Autogroup, by reason of the fact that the grounds set forth in April 19th denial letter were manipulated, contrived and not made in good faith.

102.    Plaintiffs have suffered monetary damages in excess of $75,000 as a result of GM's unlawful acts and omissions in violation of Section 12(b)(3) of the BVA.

WHEREFORE, Plaintiffs demand that judgments be entered in their favor and against Defendants in an amount in excess of $75,000, together with interest and costs.

120187280_4

## COUNT III
### (Tortious Interference With Contract)

103.    Plaintiff Brooks hereby incorporates by reference the averments contained in Paragraphs 1 through 102 of the Complaint, *supra*, as if each and all said averments were fully set forth herein.

104.    The November 2016 APA was a viable and legally enforceable agreement for the sale of substantially all of the Brooks' dealership assets to Harper Autogroup.

105.    GM intentionally and unlawfully interfered with the November 2016 APA by failing to act in a timely matter and by improperly and unlawfully denying it without adequate analysis and/or reasonable grounds.    To the contrary, the grounds set forth in GM's April 19th denial letter were dishonest, arbitrary, capricious and outcome driven.

106.    Defendants' acts and omissions were willful, malicious and undertaken with reckless indifference to the rights of Brooks.

107.    Brooks has suffered monetary damages in excess of $75,000 as a consequence of GM's improper interference with the November 2016 APA.

108.    In addition, GM's egregious acts and omissions are sufficient to warrant the imposition of exemplary and punitive damages in this case.

120187280_4

WHEREFORE, Plaintiff Brooks demands that judgment be entered in its favor and against GM in an amount in excess of $75,000, together with interest, costs and exemplary and/or punitive damages.

## COUNT IV
### (Breach of Duty of Good Faith and Fair Dealing)

109.    Plaintiff Brooks hereby incorporates by reference the averments contained in Paragraphs 1 through 108 of the Complaint, *supra*, as if each and all said averments were fully set forth herein.

110.    At all times relevant to this litigation and up until the time it sold its Buick and GMC Truck dealership assets to Harper Autogroup on September 11, 2017, Brooks and GM were parties to GM Dealer Sales and Service Agreements with respect to its Buick and GMC Truck dealership franchise operations. The express terms of the Standard Provisions of Brooks' GM dealer agreements provide that said agreements are governed by Michigan law. (A true and correct copy of the applicable GM Dealer Sales and Service Agreement Standard Provisions 2015 is attached hereto as Exhibit "I".)

111.    Pursuant to the parties' contractual and franchisor/franchisee relationship, GM owed Brooks certain contractual good faith and fair dealing duties.

120187280_4

112.   GM breached its duties of good faith and fair dealing to Brooks through the following concerted acts and omissions:

(a)    directing and requiring Brooks to remodel its Memorial Boulevard Property to meet GM facility requirements in 2009 knowing that GM was on the brink of bankruptcy;

(b)    representing that the 2009 construction costs could be paid for through GM's EBE program and then failing to allocate a sufficient and adequate number of "high demand" vehicles to Brooks to allow it to generate sufficient EBE funds necessary to pay its operational and fixed expenses, including the cost of the construction financing on Brooks' remodeled Memorial Boulevard facility;

(c)    unreasonably refusing to approve Brooks' request to add a Chevrolet franchise dealership at its Memorial Boulevard Property without adequate analysis or investigation;

(d)    advising Brooks to sell its Buick and GMC Truck dealerships;

(e)    failing to properly consider and approve the proposed sale of Brooks' dealership franchises to Harper Autogroup through the November 2016 APA in a timely manner;

(f)    denying Brooks proposed sale to Harper Autogroup through the November 2016 APA without adequate analysis and/or investigation;

(g)    unreasonably denying Brooks proposed sale to Harper Autogroup through the November 2016 APA through unreasonable, arbitrary and capricious grounds;

(h)    acting in bad faith with respect to its dealings with Brooks, including its consideration of the November 2016 APA; and

(i)    acting in bad faith with respect to of the June 2017 APA by further delaying the application process and approval of the Harper Autogroup for no materially legitimate business reasons given the duties owed to Brooks.

113.    As a direct result of GM's aforementioned acts and omissions, Brooks has suffered substantial monetary damages in excess of seventy-five thousand dollars ($75,000).

120187280_4

WHEREFORE, Plaintiff Brooks demands that judgment be entered in its favor and against Defendants in an amount in excess of seventy-five thousand dollars ($75,000) together with interest, costs and punitive damages.

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand trial by jury on all claims and issues so triable.

Respectfully submitted,

DILWORTH PAXSON LLP

Dated: __6/14/18__

John B. Consevage, Esq.
PA Atty. I.D. No. 36593
Jerry R. DeSiderato, Esq.
PA Atty. I.D. No. 201097
Penn National Insurance Plaza
2 N. 2nd Street, Suite 1101
Harrisburg, PA 17101
Tel.: (717) 213-4105
Fax: (717) 236-7811
jconsevage@dilworthlaw.com
jdesiderato@dilworthlaw.com

*Attorneys for Plaintiffs – Brooks Oldsmobile-Cadillac-GMC Truck, Inc. d/b/a Brooks Automotive Group, Inc. and B.L.P. Real Estate, LLC*

120187280_4