## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BROOKS AUTOMOTIVE GROUP, INC. | : | |
| formerly known as BROOKS | : | |
| OLDSMOBILE-CADILLAC- | : | CIVIL NO. 2:18-CV-00798-MJH |
| GMC TRUCK, INC. and | : | |
| B.L.P. REAL ESTATE, LLC, | : | Hon. Marilyn J. Horan |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| GENERAL MOTORS LLC, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |

## PLAINTIFFS' BRIEF IN SUPPORT MOTION FOR RECONSIDERATION OF THE COURT'S OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS COUNT III OF PLAINTIFFS' COMPLAINT

NOW COME Plaintiffs Brooks Automotive Group, Inc. formerly known as Brooks Oldsmobile-Cadillac-GMC Truck, Inc. ("Brooks") and B.L.P. Real Estate, LLC ("BLP") (collectively "Plaintiffs"), by and through their undersigned counsel, and file the within Plaintiffs' Brief In Support of Motion For Reconsideration of the Court's Opinion and Order dismissing Count III of Plaintiffs' Complaint.

## I.    RELEVANT PROCEDURAL BACKGROUND

Plaintiffs filed their Summons and Complaint on June 14, 2018.  On October 18, 2018, Defendant General Motors LLC ("GM") filed its Partial Motion to Dismiss ("Motion") seeking dismissal of the majority of the claims set forth in Plaintiffs' Complaint.  Argument on GM's Motion was conducted by the Court on January 15, 2019.  On February 5, 2019, the Court issued its Opinion and Order ("Order") granting in part and denying in part Defendant GM's Motion.

Plaintiffs' now seek reconsideration of the Court's Order with respect to its dismissal of Court III of Plaintiffs' Complaint, alleging GM's tortious interference with Brooks' asset sale contract with Harper Autogroup, and its attendant claim for punitive damages.

## II.   **RELEVANT FACTUAL BACKGROUND**

At all relevant times prior to the sale at issue, Brooks operated as an authorized Buick and GMC Truck dealer pursuant to a dealer sales and service agreement with GM. (Amended Complaint, ¶ 7.)   On November 17, 2016, Brooks entered into a written asset purchase agreement with Harper Autogroup for the sale of substantially all of its Buick and GMC Truck dealership assets (the "November 2016 APA"). (*Id.* at ¶ 32.)   The November 2016 APA contemplated that Brooks would sell its franchise assets to Harper Autogroup who would relocate them to its existing dealership facility located in Belle Vernon, Pennsylvania. (*Id.* at ¶ 33.)   Effectively, Harper Autogroup planned to consolidate the Brooks' Buick assets with its existing Buick dealership; and relocate Brooks' GMC Truck dealership to the Harper Autogroup dealership campus in Belle Vernon. *Id.*

In accordance with the terms of its GM dealer sales and service agreement, Brooks submitted the November 2016 APA to GM for review and approval. (*Id.* at ¶¶ 34-36.)   Harper Autogroup concurrently submitted its application to become a GM dealer through its acquisition of the Brooks' dealership assets. (*Id.* at ¶¶ 37-41.)

GM denied Brooks' request and Harper's application by letter dated April 19, 2017. (*Id.* at ¶ 45.)   Brooks claims that GM's denial was untimely under the requirements of Section 12(b)(5) of the Pennsylvania Board of Vehicle Act (the "Act") (63 P.S. § 818.12(b)(5); and unreasonable under the terms of Section 12(b)(3) of the Act. 63 P.S. § 818.12(b)(3). (*Id.*, Counts I and II.)

Brooks also claimed, *inter alia*, that by reason of its aforementioned violations of the Act, GM tortiously interfered with the November 2016 APA between Brooks and Harper Autogroup under Pennsylvania common law. (Complaint, Count III.)  Brooks also sought punitive damages against GM as a result of its willful, malicious and/or reckless conduct in association with its tortious inference with Brooks' sales contract.  *Id.*

The Court's Order allowed Brooks Section 12(b)(3) claim to stand; and provided Brooks with leave to amend its Section 12(b)(5) claim.  Brooks has now filed an Amended Complaint in accordance with the Court's Order.

The Court also dismissed Brooks' tortious interference with contract claim under Count III of the Complaint, with prejudice, along with Brooks' claim for punitive damages.  Plaintiffs now seek reconsideration of the Court's rulings with respect to Count III of the Complaint.

## III.   QUESTION PRESENTED

> Whether the Court's Order dismissing Count III of Plaintiffs' Complaint is legally erroneous?

> [Suggested Answer in the Affirmative.]

## IV.   ARGUMENT

The Court's dismissal of Count III contradicts longstanding Third Circuit precedent established in *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1381-82 (3d. Cir. 1992).  In *Big Apple*, the Third Circuit expressly acknowledged that a manufacturer's "unreasonable withholding" of consent to a proposed sale of dealer's franchise assets in violation of Section 12(b)(3) of the Act would nullify the manufacturer's "privilege" under Section 766 of the Restatement (Second) of Torts adopted by Pennsylvania and thereby create a viable claim for tortious interference with contract under Pennsylvania common law.  (*Id.* at 1381-82.)

As specifically stated by the Third Circuit in *Big Apple BMW*, "BMW NA's allegedly disingenuous delay in taking ... [the applicants] application for ... [the selling dealer's] franchise if found by the jury to have violated the Pennsylvania Board of Vehicles Act and to have been sufficiently intentional, could also constitute improper interference ... [with contract]." *Id.* at 1382.

In *Crivelli v. General Motors Corporation*, 215 F.3d 386 (3d. Cir. 2000), the Third Circuit had an opportunity to revisit its ruling in *Big Apple* in the context of a claim that GM's exercise of a right of first refusal constituted "unreasonable withholding" under Section 12(b)(3) of the Act.  The Court compared the right of right refusal to the consent requirement and found that while both mechanisms provide the manufacturer with the right to control the selection of franchises, a right of first refusal is less restrictive as it requires the manufacturer/franchisor to match the terms offered for the franchise by the proposed third party buyer. *Id.* at 390-391.

The Third Circuit found that a manufacturer's exercise of a right of first refusal would likely cause no harm to the selling dealer and therefore, was not subject to the purpose and intent of the "unreasonably withholding consent" prohibitions under what is now Section 12(b)(3) of the Act.[1]  Thus, the Court in *Crivelli* dismissed Crivelli's Section 12(b)(3) claim and, as a result, Crivelli's tortious interference claim. *Id.* at 392, 395-396.

Subsequently, in *Rosado v. Ford Motor Company*, the Court expressly found that a tortious interference claim depends on whether the defendant acted in violation of the Pennsylvania Board of Vehicles Act. *Rosado v. Ford Motor Company, supra,* 337 F.3d at 296. Because Rosado, as a disappointed buyer, did not have standing to assert a claim challenging the manufacturer's exercise of its right of refusal, the Court dismissed both Rosado's claims under the Act and for tortious interference with contract.

---

[1] Section 12(b)(3) of the Act was previously Section 9(b)(3) before being amended in 1996. *Id.* at 390.

120776899_1

In the case *sub judice*, Brooks claim for unreasonable withholding of consent to the sale of its franchise assets pursuant to Section 12(b)(3) of the Act remains legally viable and there is no exercise of a right of first refusal on the part of GM at issue. Thus, the Third Circuit's decision in *Big Apple* remains good law and applies to the case *sub judice*.

The Court's Order with respect to Count III is legally erroneous and in violation of existing Third Circuit precedent. *Big Apple BMW, Inc. supra; see also, Gabe Staino Motors Inc. v. Volkswagen of America, Inc.* 2005 WL 1041196 *17 (E.D. Pa. 2005) (dismissing plaintiffs' tortious interference claim after trial based upon its finding that defendant manufacturer did not violate any section of the Pennsylvania Board of Vehicles Act). (Copy attached.)

Pennsylvania law clearly provides for punitive damages if a plaintiff can establish willful, malicious and/or reckless conduct in association with a defendant's tortious interference with contract. *Golden ex rel. v. Golden*, 382 F.3d 348, 356-57 (3d Cir. 2004) (*citing Judge Tech. Servs., Inc. v. Clancy*, 813 A.2d 879, 888-90 (Pa. 2002.) Thus, if Brooks' claim for tortious interference is legally viable, so is its claim for punitive damages based upon alleged willful, malicious and reckless conduct on the part of GM. (*See* Complaint, Count III.)

## V.   **CONCLUSION**

For reasons set forth in Plaintiffs' Motion and herein, Plaintiffs' respectfully request that their motion for reconsideration be granted and the Court's Order be modified and amended to reinstate Count III of the Complaint.

120776899_1

Dated: __2/19/19__

Respectfully submitted,

DILWORTH PAXSON LLP

John B. Consevage, Esq.
PA Atty. I.D. No. 36593
Jerry R. DeSiderato, Esq.
PA Atty. I.D. No. 201097
Penn National Insurance Plaza
2 N. 2nd Street, Suite 1101
Harrisburg, PA 17101
Tel.:  (717) 213-4105
Fax:  (717) 236-7811
jconsevage@dilworthlaw.com
jdesiderato@dilworthlaw.com
*Attorneys for Plaintiffs*

120776899_1

Case 2:18-cv-00798-MJH   Document 39   Filed 02/19/19   Page 7 of 25

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

KeyCite Yellow Flag - Negative Treatment
Distinguished by Rohrich Cadillac, Inc. v. Bureau of Professional
and Occupational Affairs, State Bd. of Vehicle Mfrs., Dealers and
Salespersons, Pa.Cmwlth., July 11, 2013

2005 WL 1041196
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

GABE STAINO MOTORS, INC. t/d/
b/a Gabe Staino Chrysler–Plymouth
Volkswagen and Gabriel Staino, Plaintiffs
v.
VOLKSWAGEN OF AMERICA, INC., Defendant

No. Civ.A.99–5034.
|
April 29, 2005.

**Synopsis**
**Background:** Dealership brought action against
automobile manufacturer, stemming from alleged breach
of franchise agreement.

**Holdings:** The District Court, Pratter, J., held that:

[1] dealership had standing to bring action, and

[2] manufacturer's exercise of right to withhold consent for
transfer of dealership did not violate Pennsylvania Board
of Vehicles Act.

Judgment for defendant.

West Headnotes (2)

[1]     **Assignments**
        Equities and Defenses Between Original
        Parties
        **Contracts**
        Exculpatory Contracts
        Dealership had standing to bring action
        against automobile manufacturer, stemming
        from alleged breach of franchise agreement,

where transfer agreement between dealership
and successor did not contain language
conveying clear intent to release manufacturer
from liability.

1 Cases that cite this headnote

[2]     **Antitrust and Trade Regulation**
        Transfer, Sale, and Assignment
        Automobile manufacturer's exercise of right,
        pursuant to franchise agreement, to withhold
        consent for transfer of dealership did not
        violate Pennsylvania Board of Vehicles
        Act; would-be transferee did not meet
        manufacturer's reasonable requirements for
        appointment as dealer regarding adequacy
        of facility and business history. 63 P.S. §
        818.12(b)(3).

1 Cases that cite this headnote

**Attorneys and Law Firms**

Mary E. O'Laughlin, Philadelphia, PA, Christopher
Grant Barnes, Michael J. Fagan, Ronald L. Glick, Cherry
Hill, NJ, for Plaintiffs.

John B. Consevage, Harrisburg, PA, for Defendant.

Robert C. Keller, Upper Darby, PA, for Movant.

Findings of Fact, Conclusions
of Law and Verdict of the Court

PRATTER, J.

*INTRODUCTION*
**\*1** In this case the Plaintiffs, Gabe Staino Motors, Inc.
and Gabriel Staino (jointly "Staino"), allege three causes
of action against the Defendant Volkswagen of America
("Volkswagen"), including: (1) breach of the Volkswagen
Dealer Agreement entered into between the parties; (2)
a violation of the Pennsylvania Vehicle Manufacturers,
Dealers and Salespersons Act, 63 P.S. § 818.12(b)(3) (the
"Board of Vehicles Act"); and (3) tortious interference
with prospective economic advantage. Staino bears the
burden of proof by the preponderance of the evidence

**Case 2:18-cv-00798-MJH   Document 39   Filed 02/19/19   Page 8 of 25**

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

with respect to the requisite elements for each count of the complaint.

In this non-jury trial, the Court was the sole judge of the credibility of the various witnesses who testified in this matter. In the order in which they appeared, the witnesses at trial were:

- Gabriel A. Staino, plaintiff and owner of plaintiff Gabe Staino Motors, Inc.

- Deborah Kingsbury, in-house attorney at Volkswagen of America in charge of the Volkswagen brand, including dealer issues.

- William W. Welsh, Volkswagen district sales manager.

- Matthew R. Weiss, employed by Piazza Management, overseeing operations of Piazza's automobile dealership.

- Robert Duncan, Lower Merion Township Director of Building and Planning.

- Larry Bloomquist, retired Vice President, Automotive Development Design Forum.

- Frank Jeffrey Kovacs, CPA, Plaintiffs' damages expert witness.

- Herbert P. Walter, CPA, Defendant's damages expert witness.

*FINDINGS OF FACT*

Background Facts

1. Plaintiff Gabe Staino Motors, Inc. t/d/b/a Gabe Staino Chrysler/Plymouth/Volkswagen ("Staino Motors") is a Pennsylvania corporation, that, during the period of time from August 1990 through July 1997, owned and operated Volkswagen and Chrysler/Plymouth automobile franchises from a dealership facility located at Routes 1 and 202, Chadds Ford, Pennsylvania. *Evidentiary Stipulation* at ¶ 1.

2. Plaintiff Gabriel Staino, a citizen of Pennsylvania, was, during the time of the proposed sales transactions at issue, president and the sole shareholder of Staino Motors. Mr. Staino was also the dealer principal for the Volkswagen and Chrysler/Plymouth franchises owned and operated by Staino Motors. *Evidentiary Stipulation* at ¶ 2.

3. Volkswagen is a New Jersey corporation with a principal place of business in Auburn Hills, Michigan. Volkswagen is the exclusive distributor of Volkswagen automobiles and products in the United States. These products are sold to the public through a dealer network established by Volkswagen and governed by written dealer agreements between Volkswagen and its respective dealers, as well as by state and federal law. *Evidentiary Stipulation* at ¶ 5.

4. Mr. Staino has had extensive experience in the automobile dealership business, having started in the industry as a salesman when he was eighteen years old. *G. Staino, Nov. 9 Trans.* at 10:21–25.

*2 5. After working for thirteen years as a salesman, Mr. Staino obtained a minority ownership interest in a Chrysler–Plymouth dealership in Atlantic City, New Jersey. *G. Staino, Nov. 9 Trans.* at 11:10–18.

6. In 1990, after working in Atlantic City for seven years, Mr. Staino purchased a Chrysler–Volkswagen dealership in Chadds Ford, Pennsylvania from the bankruptcy estate of Richard Silverman. *G. Staino, Nov. 9 Trans.* at 11:19–23; 110:14–22.

7. The Chadds Ford dealership, located at the intersection of Routes 1 and 202, is the dealership that is the subject of this dispute. *Evidentiary Stipulation* at ¶ 1.

8. Mr. Staino operated Volkswagen and Chrysler–Plymouth automobile franchises from August 1990 through July 1997 at the Chadds Ford dealership location. *Evidentiary Stipulation* at ¶ 1.

9. The facility that housed the Chadds Ford dealership was owned by Chrysler Realty and leased to Staino Motors. *Evidentiary Stipulation* at ¶ 6.

10. Some time during late 1996 or early 1997, Chrysler initiated a program to merge its Chrysler–Plymouth division with its Jeep–Eagle division. *G. Staino, Nov. 9 Trans.* at 16:8–11.

11. After a failed attempt to incorporate a Jeep dealership into the Chadds Ford facility, Mr. Staino believed he would be at a competitive disadvantage in operating a dealership that only sold Chrysler automobiles while other Chrysler dealers also could sell Jeep products. *G. Staino, Nov. 9 Trans.* at 18:4–5.

Case 2:18-cv-00798-MJH   Document 39   Filed 02/19/19   Page 9 of 25

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

12. By late 1996, the Staino Motors Chadds Ford dealership was not profitable and had indebtedness of approximately $800,000. *G. Staino, Nov. 9 Trans.* at 116:13–20; 118:8–10.

13. As a result of the combination of its financial difficulties and the anticipated competitive disadvantage associated with the Chrysler portion of the dealership, in early 1997 Mr. Staino made the decision to sell the Chrysler–Plymouth dealership in order to pay off some of the mounting Staino Motors debt. *G. Staino, Nov. 9 Trans.* at 116:8–12; 120:16–19.

14. On March 14, 1997, Staino Motors entered into a written asset purchase agreement to sell all of the assets of the Staino Motors' Chrysler–Plymouth franchise to the principals of an entity known as West Chester Jeep. *Evidentiary Stipulation* at ¶ 7.

15. The asset purchase sale between Staino Motors and the principals of West Chester Jeep closed on July 11, 1997, following which the Staino Motors' lease for the Chadds Ford facility was assigned to West Chester Jeep. *Evidentiary Stipulation* at ¶ 8.

16. One of the conditions of the sale of Staino Motors Chrysler–Plymouth dealership was that Staino Motors would be required to terminate its use of the Chadds Ford facility for the sale and services of Volkswagen vehicles. *Ex.* D–201 at § 9A(13).

Volkswagen's Relationship with Staino

17. Volkswagen and Gabe Staino Motors are parties to a Volkswagen Dealer Agreement (the "Dealer Agreement") dated January 1, 1992, the terms of which apply to all of the transactions and events at issue in this case. *Ex.* P–104.

**\*3** 18. The Volkswagen Dealer Agreement provided that if Mr. Staino failed to operate the dealership for more than five consecutive business days, Volkswagen could terminate the agreement. *Ex.* D–3 at Art. 13(1)(f). Thus, when Mr. Staino decided to sell his Chrysler–Plymouth dealership, he viewed his options as being either to sell or to relocate the Volkswagen dealership on or before July 18, 1997, five business days after closing the sale of his Chrysler–Plymouth dealership. No evidence was presented to indicate that Volkswagen would have invoked the "5–day" termination provisions against Mr. Staino.[1] By all accounts, Mr. Staino

and Volkswagen enjoyed a good business relationship, with Mr. Staino attaining a position on Volkswagen's "President's Council" and the "Dealer Round Table," which were groups of dealers tapped for insight into how to best market Volkswagen products.[2] *G. Staino, Nov. 9 Trans.* at 29:7–25; 30:1–11; *W. Welsh, Nov. 10 Trans.* at 89:17–25; 90:1–10.

[1]   At trial, the parties stipulated to the inclusion of several pieces of correspondence evidencing a "standstill agreement" between counsel for Volkswagen and John Oyler, Esquire and Robert Arangio, Esquire as counsel for Staino. *Exs.* D–33, D–77, D–79 and D–80. Pursuant to this agreement, each party agreed to delay pursuing a legal resolution to their dispute while they tried to achieve a "business resolution."

[2]   The evidence also revealed that Mr. Staino's existing facility in Chadds Ford was small by Volkswagen's standards, but that Staino Motors achieved better than average consumer satisfaction scores despite its size. *W. Welsh, Nov. 10 Trans.* at 91:21–25; 92:1–18.

Volkswagen Policies and Procedures with its Dealers

19. Pursuant to the terms of the Volkswagen Dealer Agreement, a "Dealer's Area" is the "normal area for Dealer's Operations corresponding to the location of Dealer's Premises." *Ex.* D–3 at Art. 15(5).

20. Volkswagen's routine assessment of the performance of its dealers included an evaluation of a dealer's (1) new and used car sales; (2) performance of service obligations, including measures of customer satisfaction with the service and repair work performed; (3) sales of parts for Volkswagen vehicles; and (4) performance of responsibilities with respect to the premises, including an analysis of sales, service, and parts facilities, administrative officers, storage, parking and signage. *Ex.* D–3 at Art. 11.

21. The dealer agreement between Staino and Volkswagen, as well as the dealer agreement between Volkswagen and other dealers (including Vincent Piazza, who figures prominently in this dispute as will be discussed in depth below), expressly incorporated Volkswagen's Operating Standards and Facility Guidelines for Volkswagen Retailers, which, among other things, defined facility space requirements for automobile display and service areas. *G. Staino, Nov. 9 Trans.* at 140:7–17.

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

22. Two of the measurements Volkswagen considers important to measure customer satisfaction with its dealerships are the customer satisfaction score ("CSI") and the sales satisfaction score ("SSI"). *Ex.* D–8; *Ex.* D–2 [3] at 7. Customer satisfaction was stated as "the most important measure of a [dealer]'s performance and [was] critical to the long-term success of both the [dealer] and Volkswagen." *Ex.* D–2 at 7.

[3]    This Exhibit, which is the "Volkswagen Operating Standards and Facility Guidelines for Volkswagen Retailers," is incorporated by reference into the Volkswagen Dealer Agreement Standard Provisions. *See Ex.* D–3 at Art. 2(3).

23. The Volkswagen Operating Standards required all retail facilities to adhere to minimum space requirements set forth by Volkswagen. The Operating Standards further provided that "[f]acilities erected and approved before the initial application of such standards may continue to be operated, but new Retail Facilities and/or Facility renovations shall conform in all respects" to the Operating Standards appended to the Dealer Agreement. *Ex.* D–2 at II.A.

**\*4**   24. In evaluating a facility in order to assess its ability to operate a Volkswagen dealership, Volkswagen considered many matters, including specifically the following factors: (1) parking availability; (2) display area for new and used cars; (3) automobile service capabilities; and (4) CSI and SSI scores, which Volkswagen believes reflects how customers perceive the dealer and how the customer is treated by the dealer. *W. Welsh, Nov. 15 Trans.* at 27:12–25, 28:1–21.

25. When Volkswagen personnel conducted a facilities inspection to ascertain whether a proposed location was appropriate to house a Volkswagen dealership, it was typical that the parties in attendance would be orally advised as to whether the facility was adequate to meet Volkswagen's operating standards. *W. Welsh, Nov. 15 Trans.* at 86:1–6.

26. The Dealer Agreement provided a procedure to be followed for the transfer of the ownership of a dealership. This provision gave Volkswagen the right to approve "proposed transferees, the new owners and executives, and, if different from Dealer's, their premises." *Ex.* D–3 at Article 12(1).

27. The terms of the Dealer Agreement also provided that Volkswagen was obligated to "consider in good faith any such proposal" the dealer submitted with respect to a proposed transfer of ownership of the dealership. *Ex.* D–3 at Art. 12(1).

28. In evaluating a proposal to transfer the dealership, the Dealer Agreement allowed Volkswagen to consider "the personal, business and financial qualifications of the proposed new owners and executives, as well as the proposal's effect on competition." *Ex.* D–3 at Article 12(1).

Staino's Proposed Transfers

29. On April 4, 1997, Mr. Staino and Staino Motors entered into an asset purchase agreement for the sale of substantially all of the assets of the Staino Motors Volkswagen franchise to Charlie Victor, Inc. d/b/a West Chester Acura ("Charlie Victor"), an entity owned and operated by Vincent Piazza. *Evidentiary Stipulation* at ¶ 9.

30. In addition to the Charlie Victor Acura dealership, Mr. Piazza, through a company called Piazza Operations, Incorporated ("Piazza Operations"), owned and operated several other automobile dealerships, including a Volkswagen dealership located in Ardmore, Pennsylvania. *G. Staino, Nov. 9 Trans.* at 53:1–25; 54:1–5. Thus, Volkswagen had prior business experience with Mr. Piazza as an automobile dealer and business person.

31. Part of Volkswagen's history with Mr. Piazza included a "Showroom Construction Agreement" that Volkswagen entered into with Piazza Operations in June of 1994. Pursuant to the terms of the Showroom Construction Agreement, Piazza Operations had agreed to construct a showroom exclusively for the display and sale of new vehicles authorized by Volkswagen. *Ex.* D–20 at Ex. E, ¶ 4. Based on its past experience with the local municipal land regulators, Piazza Operations would, or at least should, have been aware that it would need to obtain some type of municipal approval before the new showroom could be constructed. *R. Duncan, Nov. 15 Trans.* at 17:6–25; 18:22–25; 19:1–6.

**\*5**   32. According to the terms of the Showroom Construction Agreement, the new Piazza Volkswagen showroom was to be completed and fully operational on or before June 30, 1995. *Ex.* D–20 at ¶ 6(d).

**Case 2:18-cv-00798-MJH   Document 39   Filed 02/19/19   Page 11 of 25**

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

33. Piazza Operations did not submit an application for zoning approval of the addition needed for the new showroom until July, 1995. *R. Duncan, Nov. 15 Trans.* 15:5–10.

34. The new Piazza showroom was not actually completed until 1999, some four years late, in part due to zoning variance difficulties. *R. Duncan, Nov. 15 Trans.* at 21:10–14; *M. Weiss, Nov. 10 Trans.* at 264:6–9. Upon its completion, the showroom was not used exclusively to display Volkswagen products, but was also used to display Acura products. *M. Weiss, Nov. 10 Trans.* at 264:6–9.

35. From the 1997 calendar year, Piazza's Ardmore Volkswagen consistently ranked in the bottom half of all Volkswagen dealerships on its sales "SSI" and service "CSI" score evaluations. *Exs. D–124–145; W. Welsh, Nov. 10 Trans.* at 160–64.

36. As a result of the foregoing, prior to considering the proposed sale of Staino Motors to Piazza's Charlie Victor, Volkswagen had concerns with respect to the performance of the Ardmore Volkswagen dealership run by Mr. Piazza. *W. Welsh, Nov. 15 Trans.* at 29:9–12.

37. Under the terms of the proposed asset purchase agreement between Staino and Charlie Victor and/or Piazza Operations, Mr. Staino's existing Volkswagen dealership was to be relocated to Piazza's Charlie Victor Acura facility and would operate as a "dual" dealership that sold both Acura and Volkswagen products. *G. Staino, Nov. 9 Trans.* at 12–15.

38. Pursuant to the Asset Purchase Agreement, Piazza's Charlie Victor agreed to pay Staino $650,000 in total for the tangible and intangible assets of Staino Motors. *Ex. D–1* at § 2.A.

39. Closing of the Asset Purchase Agreement was conditioned upon approval of the sale by Volkswagen, and a copy of the Asset Purchase Agreement was provided to Volkswagen for approval of the sale. *Ex. D–1* at § 3.A; *Evidentiary Stipulation* at ¶ 10.

40. With respect to the proposed sale of the Staino Volkswagen dealership to Charlie Victor, Mr. Staino, in conjunction with Charlie Victor and Mr. Piazza, invited William Welsh, the area executive for Volkswagen, to visit the Charlie Victor Acura facility. *Evidentiary Stipulation* at ¶ 11.

41. Pursuant to a request by Mr. Staino, Mr. Welsh, accompanied by Robert Nix, a Volkswagen area operations manager, visited the Charlie Victor Acura facility to assess whether it could accommodate the Volkswagen dealership. [4] *Evidentiary Stipulation* at ¶ 12; *G. Staino, Nov. 9 Trans.* at 57:12–25; 58:1. At that meeting, Volkswagen's Mr. Welsh informed Matthew Weiss, the director of operations for Piazza Management, that the West Chester facility was not adequate to incorporate Mr. Staino's Volkswagen dealership. Specifically, Mr. Welsh told Mr. Weiss that the service and parts departments' sizes were inadequate to meet Volkswagen standards, that the show room appeared to be inadequate, and that the size of the parking lot was inadequate. *W. Welsh, Nov. 10 Trans.* at 106:3–7.

[4] There is contradictory testimony between Mr. Staino and Mr. Welsh as to when this facility visit occurred. While Mr. Welsh contends that he visited the West Chester Acura facility on April 8, 1997, Mr. Staino asserts that the visit occurred on April 22, 1997—after the asset purchase agreement had been rejected. *See G. Staino, Nov. 9 Trans.* at 57:12–13; 100:7–8. While the Court does not question the sincerity of Mr. Staino's testimony, the Court concludes that his memory is inaccurate, as the letter from Volkswagen rejecting the Asset Purchase Agreement and relocation of the dealership, dated April 17, 1997, makes reference to the fact that the West Chester Acura facility had been visited. *See Ex. D–4.* This letter supports at least the sequence of events as recalled by Mr. Welsh, if not necessarily the visit's actual date as he recalled it.

**\*6** 42. At the same meeting, Mr. Weiss conveyed to Mr. Welsh the possibility of modifying the West Chester facility so that it could accommodate Mr. Staino's dealership. Mr. Weiss specifically suggested the possible addition of four to six service bays on the side of the building, and stated that Piazza Operations was "in discussions" to purchase a motel property adjacent to the Charlie Victor Acura dealership, which could afford more space to house inventory. *M. Weiss, Nov. 10 Trans.* at 208:22–25; *W. Welsh, Nov. 10 Trans.* at 106:16–25. Mr. Weiss also suggested the possibility of using a building adjacent to the West Chester Acura dealership, which the Piazza Operations owned and had leased to the owner of a Mazda dealership, to allow for more space. *M. Weiss, Nov. 10 Trans.* at 207:14–25; 208:1–4.

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

43. The Piazza Operations did not purchase the adjacent motel property until September of 2002, some five years after the Welsh visit during which Mr. Weiss made reference to the motel property option. *M. Weiss. Nov. 10 Trans.* at 252:5–7.

44. Notwithstanding Mr. Weiss's reference to it as a way to make the property possibly compliant with Volkswagen's facilities requirements, the lease for the building housing the Mazda dealership adjacent to the Charlie Victor's Acura facility was not set to expire until February 28, 1998, included two five-year renewal options for the lessor, and, as of the trial of this matter, continued to house the Mazda facility. *M. Weiss. Nov. 10 Trans.* at 250:12–15; 251:1–10.

45. On April 17, 1997, Mr. Welsh sent a letter to Mr. Staino indicating that Volkswagen was rejecting the proposed sale and relocation of the Staino Motors dealership to Charlie Victor's Acura. *Ex.* D–4. The stated reason for Volkswagen's rejection was that the Charlie Victor Acura facility did not have adequate space to support the number of vehicles that Volkswagen anticipated would be sold there in accordance with its business plan. *Ex.* D–4.

Further Interaction Between Staino and Volkswagen

46. After Volkswagen's initial refusal to approve the Piazza/West Chester Acura Asset Purchase Agreement, Mr. Staino sent several letters to various representatives of Volkswagen seeking assistance with the sale of his dealership.

47. On or about April 25, 1997, at the suggestion of Volkswagen, Mr. Staino met with Craig Scott, who owned a Honda dealership in West Chester, regarding Mr. Scott's possible interest in purchasing Mr. Staino's Volkswagen dealership. *G. Staino, Nov. 9 Trans.* at 61:9–13.

48. On or about May 2, 1997, Robert Arangio, then counsel for Mr. Staino, sent a letter to Mr. Welsh expressing concern regarding Volkswagen's rejection of the original Piazza Asset Purchase Agreement. Mr. Arangio specifically expressed concern as to Volkswagen's rejection of operating a dual dealership at the Charlie Victor Acura facility given that Mr. Staino had previously operated the dual dealership with his Chrysler–Plymouth dealership. *Ex.* D–27.

*7 49. On or about May 9, 1997, Mr. Arangio sent another letter to Mr. Welsh, this time requesting mediation to resolve the parties' dispute with respect to the sale of Mr. Staino's Volkswagen dealership to Mr. Piazza. Mr. Staino specifically requested immediate approval of the sale of the dealership to Piazza's Charlie Victor. *Ex.* D–28.

50. Also on or about May 9, 1997, before Mr. Scott and Mr. Staino discussed any potential terms for a transaction, Mr. Staino was informed by Volkswagen that a purchase by Mr. Scott of Mr. Staino's Volkswagen dealership could not be approved because the transaction would have infringed on another long-standing Volkswagen dealer's area of responsibility and that in the final analysis Volkswagen was not willing to pursue placing another Volkswagen dealership at the Scott location. *G. Staino, Nov. 9 Trans.* at 79:17–25; 80:1–2, 86:6–10.

51. On or about May 16, 1997, in a letter to Debra Kingsbury, Volkswagen's in-house attorney, Mr. Arangio outlined Mr. Staino's concerns with respect to the rejection of the Asset Purchase Agreement, as well as various steps Mr. Staino had taken in an effort to sell his Volkswagen dealership in a timely manner as the deadline for having to vacate the Chadds Ford facility was fast approaching. Mr. Arangio specifically discussed the details with respect to Mr. Staino's proposal that his dealership be sold to Piazza's Charlie Victor and outlined the reasons that Mr. Staino believed Charlie Victor would be a better candidate to purchase the dealership than Mr. Scott. Mr. Arangio also expressed concern that Volkswagen had not informed either Mr. Staino or Mr. Weiss specifically what modifications to the Charlie Victor Acura facility would be required in order to facilitate a sale to Charlie Victor. *Ex.* D–29.

52. In the May 16, 1997 letter, Mr. Arangio stated that his "only concern in this matter is that [Staino] is able to complete his Chrysler Plymouth transaction and to sell his Volkswagen franchise for the amount that has been negotiated in good faith." *Ex.* D–29 at 9.

53. On or about May 30, 1997, having still not found a buyer for the Staino Volkswagen dealership, Mr. Arangio wrote to Ms. Kingsbury on behalf of Mr. Staino, again requesting approval to relocate his dealership to the Charlie Victor Acura facility. *Ex.* D–7.

Case 2:18-cv-00798-MJH   Document 39   Filed 02/19/19   Page 13 of 25

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

54. By this point, instead of an asset purchase deal, a different type of transaction for the proposed relocation of Mr. Staino's Volkswagen dealership had been discussed between Staino and Piazza which was now a stock purchase agreement, the terms under which Mr. Staino technically would retain 51% of the stock of Staino Motors and Mr. Piazza would purchase 49% of the stock. *Ex. D–6.*

55. Under the proposed Stock Purchase Agreement, although Mr. Staino would remain the majority owner, Staino would not be able to expend more than $5,000.00 "for any equipment, furniture, fixtures, alterations, additions or improvements, except repairs and replacements of inventory in the ordinary course of business" without the prior written consent of Mr. Piazza. *Ex. D–6 at ¶ 6M.*

**\*8** 56. On or about June 12, 1997, Ms. Kingsbury responded to the various requests submitted by or on behalf of Mr. Staino and reiterated the reasons that Volkswagen did not agree to the relocation of Staino Motors' Volkswagen dealership to the West Chester Acura dealership operated by Charlie Victor and owned by Mr. Piazza. Ms. Kingsbury also stated that Volkswagen could not approve the Stock Purchase Agreement with Charlie Victor for the same reasons that Volkswagen had opposed the Piazza Asset Purchase Agreement that was previously proposed. *Ex. D–8.*

57. Volkswagen opposed the transfer of the dealership to Charlie Victor because: (1) the move would place the new facility within an area of responsibility assigned to another Volkswagen dealer; (2) the West Chester Acura facility did not meet Volkswagen's facility requirements; (3) as a current dealer principal at another Volkswagen dealership, Mr. Piazza had CSI scores that fell far below levels that were acceptable to Volkswagen. *Ex. D–8.*

58. On or about July 31, 1997, Mr. Staino received a letter from Mr. Scott in which Mr. Scott proposed to pay Mr. Staino $300,000 for the Staino dealership. *Ex. P–84; G. Staino, Nov. 9 Trans.* at 104:2–8. This offer was never acted upon or pursued because Mr. Staino had already received a better offer for the Staino Motors dealership from Bellefair Company ("Bellefair"). *G. Staino, Nov. 9 Trans.* at 108:16–23.

59. Mr. Staino eventually sold Staino Motors to Bellefair for $650,000. *G. Staino, Nov. 9 Trans.* at 99:23–25, 100:1–

4; *Ex. D–220.* This is the same sale price set for the initial Piazza West Chester Acura asset purchase of Staino Motors for which Staino first had sought Volkswagen's approval. The Bellefair agreement of sale of the dealership was executed on July 31, 1997, three and one-half months after Mr. Staino initially proposed the Piazza/Charlie Victor original asset purchase agreement for approval by Volkswagen. The Bellefair sale closed on January 23, 1998.[5]

[5]    The Court is constrained to note the fact that roughly six years have passed since the transactions at issue. Suit was filed on October 12, 1999, following which the parties engaged in extensive and expensive pretrial warfare. Much of the case's early life dealt with the proposed involvement of Charlie Victor and Mr. Piazza as plaintiffs. In hindsight one might conclude that the Staino Plaintiffs' devotion to and dependence upon the Piazza connection to the claims that eventually proceeded to trial was not well conceived. In fact, although the Piazza plaintiffs were dismissed from the case on November 14, 2003 (Docket No. 41), for the next year of the case, up to and including trial, Staino's characterizations of the claims were inexorably entwined with the Piazza saga. See discussion at ¶¶ 63–64, *infra.* In any event, the Court expresses its regard for Mr. Staino's loyalty to Mr. Piazza and for Mr. Staino's steadfast pursuit of his litigation option and his pursuit of vindication for Piazza and Piazza's auto dealership acumen through to conclusion when others may well have opted for a more Staino-oriented pre-trial resolution.

60. In connection with the closing of the sale of the dealership, Mr. Staino executed three additional documents with respect to the transfer. These documents were titled "Surrender of Dealer Agreement" (the "Surrender"), "Assignment of Franchise" (the "Assignment"), and "Release," each of which was signed by Mr. Staino on January 23, 1998. *Exs. D–10, D–11, D–13.* The purpose of these documents was, respectively, to facilitate the transfer of the dealership to Bellefair, to cancel the dealer agreement between Staino Motors and Volkswagen, and to release Volkswagen from certain claims.

61. The Assignment states that Mr. Staino assigned all of his rights and interests as a Volkswagen franchisee to Bellefair. *Ex. D–10.* The accompanying Release stated that Volkswagen would be released from "all claims, demands, causes of action, judgments and executions ...."

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

except for "any claims that may exist against [Volkswagen] with respect to its actions concerning the proposed dealership transferees prior to the Bellefair Company." *Id.*

**\*9** 62. The complaint in this case was filed on October 12, 1999, and included counts for (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) a violation of the Pennsylvania Board of Vehicles Act; and (4) tortious interference with prospective economic advantage. By agreement of the parties, the litigation was stayed and held in suspense until April 1, 2002. At the same time, the second count of the complaint was dismissed with prejudice.

63. As originally crafted, this case included considerable attention to the grievances of Charlie Victor, Inc. and Vincent Piazza. As indicated above, both were included as plaintiffs in the case. Indeed, the theories of the claims first made against Volkswagen combined the interests of the Staino plaintiffs with those of the Piazza plaintiffs. However, on November 14, 2003, the Court entered an order granting summary judgment in favor of Volkswagen and against plaintiffs Charlie Victor, Inc. and Vincent Piazza, thereby removing those plaintiffs from the case. However, the real or perceived interdependency of the Staino and Piazza/Charlie Victor claims persisted even after the two Piazza plaintiffs were dismissed. Volkswagen's alleged antipathy, real or imagined, for Piazza that permeated the original pleadings and discovery also permeated Mr. Staino's own testimony at trial as well as that of Plaintiff's other primary witness, Matthew Weiss (a Piazza employee).

64. Mr. Staino interpreted and explained virtually all of Volkswagen's actions at issue in this case as indicative of Volkswagen's supposed antagonism for Piazza. Because Mr. Staino has obvious high regard for Mr. Piazza and the Piazza organization, Mr. Staino's testimony repeatedly disclosed his incredulity that Volkswagen did not share that regard. *See, e.g., G. Staino, Nov. 9 Trans.* at 53:1–24; 57:1-4; 61:14–18; 82:1–25; 83:1–10. The Court has not so much concluded that this segment of Mr. Staino's testimony was not earnestly believed by him as having concluded that the other evidence (other than the interpretive testimony of Mr. Piazza's employee, Mr. Weiss), gives credence to Mr. Staino's theories about Volkswagen's motivation.

*CONCLUSIONS OF LAW*

Jurisdiction

1. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the Plaintiffs and Defendant are not citizens of the same state and the amount in controversy exceeds $75,000.

2. The relationship between Staino and Volkswagen is governed by both statute and contract. The Pennsylvania Board of Vehicles Act (the "BVA," or the "Act"), *see* 63 Pa.C.S.A. § 818, *et seq.,* provides the statutory framework for the relationship, and the Volkswagen Dealer Agreement provides the contractual framework. Thus, Staino pursues both breach of contract and statutory violation claims.

Standing

3. In its Post–Trial Brief, Volkswagen raises the issue of standing, arguing that because Staino had assigned all of its right and interest in the dealership to Bellefair and had released Volkswagen of liability, Staino no longer had a right to bring suit. Volkswagen specifically argues that when read together, the Assignment, Surrender and Release documents effected "a broad release" of Volkswagen for any Staino claims arising under the Dealership Agreement.

**\*10** 4. The concept of standing involves both constitutional limitations on the jurisdiction of federal courts and prudential limitations on the exercise of federal jurisdiction. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Under the prudential rules of standing, a court must consider whether a plaintiff is the proper party to invoke judicial resolution of a particular dispute. *Mariana v. Fisher,* 338 F.3d 189, 204 (3d Cir.2003). In considering whether a party has prudential standing, a court must: (1) ensure that the plaintiff is asserting his or her own legal interests rather than those of a third party; (2) refrain from adjudicating abstract questions of wide public significance amounting to generalized grievances; and (3) determine whether a plaintiff's interests are arguably within the "zone of interests" that are intended to be protected by the statute, rule or constitutional provision on which the claim is based. *Mariana,* 338 F.3d at 204–05. Because standing is jurisdictional in nature and is a threshold issue for a federal court, it must be considered before any further analysis of the claim and defenses is conducted at this time.

5. The determination of whether Staino has standing to bring the claims herein is reduced to a matter of

Case 2:18-cv-00798-MJH · Document 39 · Filed 02/19/19 · Page 15 of 25

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

first determining what documents constituted the entire transaction, and then interpreting the entire contract. When two or more writings are executed at the same time and involve the same transaction, Pennsylvania law requires that the documents be construed and interpreted as a whole. *Sanford Investment Co., Inc. v. Ahlstrom Machinery Holdings, Inc.,* 198 F.3d 415, 421 (3d Cir.1999) (quoting *Western United Assurance Co. v. Hayden,* 64 F.3d 833, 842 (3d Cir.1995)). Finding that the Assignment, Surrender and Release documents were executed on January 23, 1998 in conjunction with the sale and transfer of the Staino Motors dealership to Bellefair, the Court concludes that these documents must be construed and interpreted together.

6. Under Pennsylvania law, the intent of the parties to a written contract is presumed to be contained in the writing itself, and extrinsic evidence to determine the parties' mutual intent may only be examined where ambiguity is present. *Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604, 613 (3d Cir.1995). A term will be found to be ambiguous if, and only if, after considering the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation, the court finds that the terms in question are susceptible to reasonable alternative interpretations. *Einhorn v. Fleming Foods of Pennsylvania, Inc.,* 258 F.2d 192, 194 (3d Cir.2001).

7. In this matter, Volkswagen urges that the Court conclude that based on a "plain meaning" reading of the transfer agreement between Bellefair and Staino, there was a clear intent by Staino to release Volkswagen from all liability with respect to the transfer, and that Staino therefore has no standing to bring the present suit.

*11 ||| 8. In the present case, the terms in the Assignment and the Release appear to directly contradict each other. There is some ambiguity, and the Court will consider the evidence presented at trial in ascertaining the meaning intended by the parties. After doing so, the Court disagrees with Volkswagen's suggested interpretation of the terms. First, after construing the Assignment, Surrender and Release documents together, the Court notes that each of the documents serve a specific purpose with respect to the parties affected. For example, the Assignment is between Staino and Bellefair, the Surrender serves as a request by Staino to Volkswagen to cancel the Dealer Agreement, and the Release addresses specific releases of liability of Volkswagen by Staino. Thus, each document appears to serve as a separate term of the

parties' agreement to transfer the dealership to Bellefair. When considered in this context, the Assignment and Release provisions initially appear to contradict each other. However, the Court concludes that the Assignment simply reflects Mr. Staino's intent to assign the dealership to Bellefair, while the Release was clearly intended to carve out certain specific claims—those relating to the "proposed transferees prior to the Bellefair Company"—which would not be part of the release. Thus, the language in the Release makes it clear that the Staino Plaintiffs intended to retain their rights to bring the present claims against Volkswagen. The Court therefore concludes Staino has standing to pursue the claims at issue.

### Violation of the Board of Vehicles Act—Unreasonable Withholding Consent to Sale

9. Section 818.12(b)(3) of the Pennsylvania Board of Vehicles Act (the "BVA," or the "Act") provides that "it shall be a violation of this act for any manufacturer ... to unreasonably withhold consent to the sale, transfer or exchange of the franchise to a qualified buyer capable of being licensed as a new vehicle dealer in this Commonwealth who meets the manufacturer's or distributor's reasonable requirements for appointment as a dealer." The Act prohibits a manufacturer from unreasonably withholding consent to the sale of a franchise to a qualified buyer. [6] *Rosado v. Ford Motor Co.,* 337 F.3d 291, 293 (3d Cir.2003).

[6]      As Volkswagen points out in its Post–Trial Brief, the Pennsylvania statute was amended in 1996 to, among other things, qualify the type of buyer to which the manufacturer may not unreasonably withhold its consent to sale. That is, a manufacturer may not unreasonably withhold its consent to sell a franchise to a *qualified* buyer. 63 P.S. § 818.12(b)(3) (emphasis added).

10. The BVA further provides that, if the manufacturer violated the Act, or if a dealer is injured by a proscribed action taken by a manufacturer, the injured dealer may seek relief for its damages. 63 Pa.C.S.A. § 818.29.

11. Under the BVA, a plaintiff bears the burden of proving that a defendant manufacturer behaved unreasonably in rejecting a proposed sale or transfer of a dealership. *See Gabe Staino Motors, Inc. v. Volkswagen of America, Inc.,*

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

No. 99–5034, 2003 WL 22735379 (E.D.Pa. Nov.14, 2003) (setting forth burden of proof for plaintiff).

[2]  12. The Staino Plaintiffs allege that Volkswagen has violated the BVA because the reasons provided by Volkswagen, namely, that the West Chester Acura facility was inadequate and that Mr. Piazza's business history with Volkswagen was less than adequate, were not the "real reasons" for rejecting the Asset Purchase and Stock Purchase Agreements. The Plaintiffs urge the Court to conclude that despite the facially legitimate reasons Volkswagen presented for rejecting the agreements, liability under the BVA should lie because Volkswagen treated the proposed Piazza Operations transaction differently than it has treated proposals from other dealerships.

*12  13. Case law interpreting the BVA is, to say the least, sparse. In fact, neither this Court nor either of the parties was able to locate a case in which a court directly addressed, positively or negatively, the BVA in the context of a manufacturer's allegedly pretextual explanation for a transfer disapproval leading to a *per se* conclusion that the manufacturer's decision was unreasonable under the Act.[7] Most of the cases in which the BVA is discussed address either a plaintiff's standing to bring a claim under the BVA or whether the Act precludes a manufacturer's exercise of a right of first refusal. *See generally Rosado v. Ford Motor Co.,* 337 F.3d 291 (3d Cir.2003)(addressing standing); *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1382 (3d Cir.1992)(addressing standing); *Crivelli v. General Motors Corp.,* 215 F.3d 386 (3d Cir.2000)(addressing manufacturer's exercise of right of first refusal.)

[7]  At trial and in his post-trial submissions, Mr. Staino repeatedly argues that under *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358 (3d Cir.1992), if a manufacturer's reasons for rejecting a proposed sale, even if legitimate on their face, are "pretextual," the decision is necessarily unreasonable. The Court does not agree that *Big Apple BMW* supports this proposition. Although the plaintiff in *Big Apple BMW* did assert a claim under the BVA, the court's finding with respect to pretext was not related to the BVA claim. The *Big Apple BMW* court found that the defendant's stated reasons for not granting the plaintiff a dealership were a pretext for a price fixing scheme that was prohibited under the Sherman Act. Pretext was not used as a test for reasonableness under the BVA. In fact, the only

issue analyzed with respect to the BVA in *Big Apple* dealt with the issue of whether the plaintiff, as a prospective dealership owner, had standing to bring the claim. Thus, *Big Apple BMW* does not stand for the proposition that, even where a manufacturer sets forth seemingly legitimate reasons, evidence of some other, underlying reason should necessitate a court's ignoring the legitimate reasons and finding that the manufacturer behaved unreasonably in violation of the BVA.

14. Given the paucity of statutory or decisional detail with respect to what constitutes an unreasonable rejection of a proposal under the BVA, the Court must look to the text of the BVA itself. Only if the statute is not clear, consideration may be given to trying to ascertain the legislative policy from which the Act arose. *See* 1 Pa.C.S.A. § 1921 (West 2005) (instructing that "[w]hen the words of a statute are not explicit," a court should ascertain the intention of the General Assembly).[8]

[8]  The Staino Plaintiffs urge that the Court look to *General Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296 (3d Cir.2001), a case which interprets the federal Automobile Dealers' Day in Court Act (the "ADDCA") for guidance with respect to the standard that should be applied in determining whether a manufacturer's actions were unreasonable under the BVA. The ADDCA requires that an automobile manufacturer act in "good faith" in relating to its dealers. *New A.C. Chevrolet, Inc.,* 263 F.3d at 304. Good faith is narrowly interpreted under the ADDCA to preclude "coercion, intimidation, or threats of coercion or intimidation." *Id.* The Staino Plaintiffs specifically ask this Court to consider the interpretation of "good faith" provided by the *New A.C.* court, which stated that "while a manufacturer does not make a wrongful demand if it merely insists that the dealer comply with a reasonable obligation imposed by the franchise agreement, a dealer can state a claim for relief under the ADDCA by alleging that the manufacturer's reliance on those objectively reasonable provisions is, in fact, motivated by a pretextual, bad faith reason." Thus, the Staino Plaintiffs urge the court to conclude that a finding of pretext would equate to unreasonable behavior under the BVA. However, such a finding is not necessary in this case. The Court does not believe that the evidence presented in this case was sufficient to support a finding that Volkswagen behaved either unreasonably or in bad faith by refusing to allow Staino Motors to be transferred, either administratively through the Asset Purchase

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

Agreement, or financially, through the limiting provisions of the Stock Purchase Agreement, to the Piazza. While the future might present either a state or federal court the opportunity to decide whether a pretextual, bad-faith action taken by a manufacturer would allow for a claim of unreasonableness under the BVA, that finding is not necessary in this case, as the evidence does not support a finding of pretext even if that legal theory was an established option in a BVA case.

15. The term "unreasonable" in the BVA is not clearly defined within the statute. While the Court will note the legislative intent underlying the BVA, there is also a wealth of case law in analogous areas in which the concepts of reasonableness and unreasonableness are discussed. *See, e.g., Milos v. Ford Motor Co.,* 317 F.2d 712, 716–717 (3d Cir.1963) (interpreting federal Automobile Dealers' Day in Court Act to conclude that manufacturer acting in the course of "honest business judgment" could not be found to be inherently unfair or arbitrary). Pennsylvania courts addressing obligations arising from franchise agreements have held that a franchisor terminating a franchisee relationship must act "in good faith and in a commercially reasonable manner." *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736, 742 (Pa.1978) (establishing standard);[9] *see also Rodgers v. Sun Refining and Marketing Co.,* 772 F.2d 1154, 1158 (3d Cir.1985) (interpreting federal Petroleum Practices Marketing Act and acknowledging "legitimate needs of a franchisor to be able to terminate ... based upon certain actions of the franchisee"); *Loos & Dilworth v. Quaker State Oil Refining Corp.,* 347 Pa.Super. 477, 500 A.2d 1155, 1161 (Pa.Super.Ct.1985) (affirming "good faith and commercially reasonable" standard). Courts applying this standard have adopted the definition of good faith codified in the commercial code, which requires "honesty in fact on the conduct or transaction occurred." *Loos & Dilworth,* 500 A.2d at 1160.

[9]   The Court notes that in *Atlantic Richfield* the court specifically stated that this standard applied where a franchise agreement did not include specific provisions addressing termination of the agreement. *Atlantic Richfield,* 390 A.2d at 742, n. 8.

**\*13** 16. In addition, opinions of other states' courts interpreting their states' statutes may be informative, and therefore provide some insight. *Crivelli,* 215 F.3d at 391. For example, in *In re Van Ness Auto Plaza, Inc.,* 120 B.R. 545, 547 (Bankr.N.D.Ca.1990), the court

stated that withholding consent to a dealership assignment would be considered reasonable to the extent that it was "based on factors closely related to the proposed assignee's likelihood of successful performance under the franchise agreement." *Van Ness,* 215 B.R. at 547.[10] The court further delineated eight factors to consider, including: (1) whether the proposed dealer has adequate working capital; (2) the extent of prior experience of the proposed dealer; (3) whether the proposed dealer has been profitable in the past; (4) the location of the proposed dealer; (5) the prior sales performance of the proposed dealer; (6) the business acumen of the proposed dealer; (7) the suitability of combining the franchise in question with other franchises at the same location; and (8) whether the proposed dealer provides the manufacturer sufficient information regarding its qualifications. *Id.*

[10]   The *Van Ness* court interpreted California's automobile dealership statute, which provided that a manufacturer could not unreasonably withhold consent to assignment of a dealership. *Van Ness,* 215 B.R. at 547.

17. The preface to the Pennsylvania legislature's most recent amendments to the BVA states that the law was enacted "to provide for fair and impartial regulation of those persons engaged in manufacturing, distributing or selling of vehicles." S.B. 808, 1996–27, 180th Gen. Assem., Reg. Sess. (Pa.1996). The legislature further instructs that the BVA be "administered in such a manner as will continue to promote fair dealing and honesty in the vehicle industry and among those engaged therein without unfair or unreasonable discrimination or undue preference or advantage." *Id.*

18. Considering the statement in the BVA that a manufacturer not "unreasonably" withhold consent in conjunction with the need for "fair dealing and honesty" without "unfair or unreasonable discrimination," the Court finds that to be reasonable, a manufacturer's decision to reject a proposed sale must strike a balance between serving the manufacturer's legitimate business purposes and affording an automobile dealer a reasonable opportunity to transfer its business without suffering an undue or unnecessary loss. The Court also observes that, contrary to what Mr. Staino implies, the BVA does not forbid "discrimination" for a legitimate business purpose, but rather forbids *unfair* or *unreasonable* "discrimination."

**Case 2:18-cv-00798-MJH   Document 39   Filed 02/19/19   Page 18 of 25**

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

19. In light of this interpretation of what would be reasonable behavior under the BVA, the Court finds that in this case Volkswagen's actions vis à vis the Staino–Piazza proposals cannot be found to have been unreasonable, as there was credible evidence that Volkswagen had legitimate business reasons for rejecting the transfer of Mr. Staino's dealership to any organization which would be actually or effectively controlled by Mr. Piazza. [11]

[11]    The Court recognizes that given the statutory goal of preventing unreasonable discrimination, there is a possibility, under appropriate circumstances, that a manufacturer could be found to have violated the BVA where its reasons for rejecting the transfer of a dealership truly were pretextual. However, for the reasons discussed herein, these Plaintiffs have not presented adequate evidence to support such a finding.

20. It does not appear to the Court from the evidence presented that the method of Mr. Welsh's inspection on behalf of Volkswagen of the Charlie Victor West Chester Acura facility was out of the ordinary or in any way biased against Mr. Staino. At trial, Mr. Welsh credibly testified as to the process he followed in reviewing a proposed facility, and explained that it was typical for him, when reviewing a proposed facility, to orally tell the parties in attendance at a facility inspection whether or not the facility would meet Volkswagen's standards. *W. Welsh, Nov. 10 Trans.* at 86:5–15. He did so in this case. Mr. Welsh also testified in detail as to the various reasons that he believed the West Chester Acura facility was inadequate to house the Staino Volkswagen dealership, including that the service department had an inadequate number of lifts, that the parts department was too small, and that the lot size of the facility was not adequate. *W. Welsh, Nov. 10 Trans.* at 106:3–7. In his testimony, Mr. Welsh acknowledged that the Piazza parties suggested possible modifications to the facility, such as the addition of service bays and the possibility of buying an adjacent lot to house more cars, but he also stated that even if these modifications were to have taken place (which by no means appeared realistic or even possible), his conclusion that the facility was inadequate would not have changed. [12] *W. Welsh, Nov. 10 Trans.* at 108:6–25; 109:16–22.

[12]    The Staino Plaintiffs attempt to make much of Mr. Welsh's non-responsiveness to the suggested modifications, arguing that this suggests that

Volkswagen had already decided not to allow the transfer of the Staino dealership to this location and that this unwillingness to consider any potential modifications is an example of how Volkswagen behaved unreasonably. However, as was explained in subsequent testimony by Mr. Weiss, *see M. Weiss, Nov. 10 Trans.* at 248–252, the proposed modifications represented only "possibilities" and, given Volkswagen's prior experiences with unfulfilled promises by the Piazza Operations, discussed herein, Volkswagen's reaction cannot be said to have been unreasonable.

**\*14** 21. Additionally, Volkswagen clearly demonstrated that it had many negative business experiences with Mr. Piazza, under circumstances that would give any business person significant—and legitimate—pause when considering whether to enter into another business relationship with that person. The evidence showed that Mr. Piazza delayed by nearly five years his contractual obligation to construct a showroom at his Ardmore Volkswagen facility, [13] that the customer service scores for Mr. Piazza's Ardmore dealership consistently ranked in the bottom half of all Volkswagen dealerships nationally, and that Piazza's Ardmore dealership had poor ratings with Volkswagen overall. *W. Welsh, Nov. 10 Trans.* at 157:5–12; 158–166:1–9. Given these circumstances, the Court finds that any business person in Volkswagen's position understandably would eschew another relationship with Piazza Operations.

[13]    Although the Staino Plaintiffs argue that many of the problems Volkswagen had with the Piazza Ardmore facility were the result of circumstances out of Piazza's control, the Court does not find these arguments to be persuasive or dispositive in the way Staino would want. The evidence showed that with respect to the Ardmore Volkswagen dealership, the Piazza company agreed to fully construct a showroom within twelve months of signing the dealership agreement. *Ex.* D–20, Ex. E at ¶ 6(d). Piazza did not do so. Considering the past experiences that the Piazza company had with the local zoning board, *see R. Duncan, Nov. 15 Trans.* at 19–23 (discussing past issues in requesting zoning variances and other permissions), the Piazza Operations should have known that this 12–month time frame was unrealistic and unachievable. It would not have been unreasonable for Volkswagen to be skeptical of Piazza projections or at least concerned that Piazza personnel had a tendency to make overly optimistic promises or proposals.

**Case 2:18-cv-00798-MJH   Document 39   Filed 02/19/19   Page 19 of 25**

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

22. The Court does not disagree that these decisions by Volkswagen reflected a hesitance on the part of Volkswagen to extend its business relationship in any way with the Piazza Operations. Staino would have the Court accept the idea that this constitutes an illegal and, therefore, actionable bias against Staino. In this regard, courts applying the law relating to other types of discrimination provides some guidance, suggesting that decisions motivated by sound and legitimate business purposes, absent illegal bias, are not subject to liability and cannot be determined as such. *See, e.g., Ezold v. Wolf, Block Schorr and Solis–Cohen,* 983 F.2d 509, 541 (3d Cir.1993) (finding that academic and intellectual bias against terminated employee were not legally actionable); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1220 (3d Cir.1988) (requiring that to maintain cause of action, plaintiff must produce evidence casting doubt on legitimate business justification). The BVA was not intended to eliminate *bias,* given that some "bias" certainly forms the basis of many legitimate business decisions. Rather, the BVA was enacted to prevent *unreasonable* bias. In this case, the Court finds that any bias Volkswagen might have exhibited against the Piazza Operations was grounded on Volkswagen's legitimate business concerns that Mr. Piazza would not, as he and his companies had not in the past, fulfill business obligations. Put differently, there is no authority or evidence to support a conclusion that Volkswagen was obliged to expand its business relationship with Piazza.

23. The Court finds that the evidence presented with respect to the inadequacy of the Charlie Victor West Chester Acura facility, considered in conjunction with Volkswagen's previous bad experiences with Piazza as the controlling force of Charlie Victor, was compelling as explanations for the Volkswagen nonapproval of the proposed Piazza–Staino stock sale transaction. These factors, when considered together, lead to the inescapable conclusion that Volkswagen's reasons for rejecting the Asset and Stock Purchase Agreements reflected Volkswagen's assessment and application of its legitimate business purposes. Moreover, given the timing constraints created by Mr. Staino's need to sell his facility (constraints that had nothing to do with Volkswagen and were not created in any way by Volkswagen), Volkswagen's concerns about the modifications that were needed to properly prepare the West Chester Acura facility to incorporate Mr. Staino's Volkswagen dealership were well founded and not unreasonable.

**\*15** 24. The Plaintiffs have, at every turn, taken great pains to try to draw a distinction between the Asset Purchase Agreement, under which Mr. Staino's entire dealership was to be sold to Piazza's Charlie Victor, and the Stock Purchase Agreement, under which Mr. Staino would retain 51% of the stock of his dealership and Mr. Piazza would hold the minority interest. In doing so, the Plaintiffs focus primarily on Volkswagen's rejection of the Stock Purchase Agreement as being the source of their damages, and argue that had that Agreement been approved and fully executed, the Plaintiffs would have achieved far greater profits (continuing many years into the future) than those which were garnered from the ultimate sale of the dealership to Bellefair. However, the Court finds that Volkswagen's rejection of the Stock Purchase Agreement does not substantively differ from its rejection of the Asset Purchase Agreement. The evidence at trial demonstrated the distinction between the Asset Purchase Agreement and Stock Purchase Agreement to be one without a difference for the purposes of Volkswagen's alleged violation of the BVA. As the evidence demonstrated, if the stock transaction had gone forward, despite Mr. Staino's majority ownership under the Stock Purchase Agreement, any expenditure for equipment, furniture, fixtures, alterations, additions or improvements by the resulting dealership in excess of $5,000.00 would require the approval of Mr. Piazza. *See Ex.* P–73, Proposed Stock Purchase Agreement at ¶ 6M.[14] Thus, by express design, Mr. Piazza was to have a significant amount of managerial and financial control of the resulting dealership under the Stock Purchase Agreement. Considering the documented difficulties that Volkswagen had had with Mr. Piazza, the Court finds that Volkswagen's concerns with respect to the Stock Purchase Agreement were reasonable.

14    The Court notes that repairs and replacements of inventory in the ordinary course of business were excepted from this provision. *Ex.* P–73 at ¶ 6M. However, the modifications that were proposed to bring the West Chester Acura facility in compliance with Volkswagen's operating procedures would not have fallen into the category of repairs or replacements in the ordinary course of the dealership's business but, rather, would have been fully subject to Piazza's decision-making "pocket-veto" authority.

25. At trial, the Staino Plaintiffs argued that Volkswagen's rejections of the Asset Purchase Agreement and the Stock Purchase Agreement were unreasonable because

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

Volkswagen's stated reasons were a pretext to avoid having Mr. Piazza own another Volkswagen dealership, preferring instead to orchestrate transfer of Staino Motors to Craig Scott. The Staino Plaintiffs' theory of Volkswagen's motivation in this regard was that because Mr. Welsh's brother worked at the Scott dealership, a Staino–Scott transaction would somehow allow Mr. Welsh's brother to garner favor with Mr. Scott. The Court finds this argument to be unpersuasive. Although Mr. Staino did receive an offer to buy the dealership from Mr. Scott, *Ex. P–84,*[15] the dealership was not ultimately sold to Mr. Scott because another dealer whose area of responsibility would have been affected objected to the relocation. The Court also notes that the evidence presented at trial demonstrates that Mr. Scott was also not willing to pay the price that Mr. Staino demanded.[16] Moreover, the testimony that Volkswagen was negotiating with Mr. Staino to "make up the difference" between the price Mr. Scott was willing to pay and Mr. Staino's required price, *see G. Staino, Nov. 9 Trans.* at 67:7–12, is only indicative of Volkswagen's voluntary efforts to help Mr. Staino, an admittedly well-regarded Volkswagen dealer, find a buyer for the dealership after Volkswagen knew that it could not approve the Piazza Asset Purchase and Stock Purchase Agreements.

[15]   The Court notes that the Scott proposal letter is dated July 31, 1997—the same date that the actual sale of the dealership to Bellefair was executed.

[16]   Mr. Staino indicated that he would not be willing to accept less than $650,000 for the dealership, the price agreed to in the Charlie Victor Asset Purchase Agreement. *G. Staino, Nov. 9 Trans.* at 61:14–18. Inasmuch as the Piazza asset purchase proposal and the actual asset sale to Bellefair, the agreement for which was executed on July 31, 1997, some 15 weeks after Volkswagen's rejection of the Asset Purchase Agreement and 7 weeks after the rejection of the Stock Purchase Agreement, were both for a $650,000 purchase price, the Court concludes that Mr. Staino believed that this represented his view of the value of the dealership. It is an inescapable and significant observation that Mr. Staino did enter into an agreement to sell the dealership for this same $650,000 amount within approximately four months of his initially placing it on the market for sale and indicating readiness to accept that purchase price when it was offered by Piazza.

*16   26. The Court does not question the ardor with which Mr. Staino testified. Certainly, he has harbored strong and emotional views about his business career and the events at issue for many years. However, the Court also must observe that in many respects, Mr. Staino's testimony reflected both the results of years of mulling and replaying the events in question with the Piazza parties and Mr. Staino's assumptions, surmises, speculations and justifications as he has come to believe would support his claims. The evidence presented at trial simply did not support those theories Mr. Staino so passionately had come to embrace.

27. For the reasons discussed above, the Court finds that Volkswagen rejected the proposals in question for valid, legitimate and fair business reasons, and therefore finds in favor of Volkswagen with respect to the BVA claim.

Breach of Contract Claim

28. The Plaintiffs allege that through Volkswagen's repeated rejections of the transfers to Mr. Piazza, Volkswagen breached its contractual obligation to act in good faith to consider the Plaintiffs' proposals to transfer the dealership.[17]

[17]   The Complaint initially included a count alleging a violation of the implied covenant of good faith and fair dealing. However, this count was dismissed by an Order dated April 1, 2002. *See* Docket No. 13.

29. The Plaintiffs argue that because their claims that Volkswagen's reasons were pretextual are closely intertwined with the assertion that Volkswagen failed to act in good faith in rejecting the proposed transfers, the various claims for violation of the BVA and breach of contract must be analyzed together and that one claim cannot fail if the Court finds that the other is viable.[18] The Court agrees that the two are closely related, but notes that in this case different analyses should apply to each claim, inasmuch as the BVA claim must be decided pursuant to the terms of the statute and the breach of contract claim must be decided pursuant to the terms of the contract between the Plaintiffs and Volkswagen.[19]

[18]   In support of this argument, the Staino Plaintiffs present *Gager v. Mobil Oil Corp.,* 547 F.Supp. 854, 861 (D.Conn.1982), in which the court concluded that a reasonableness standard with respect to the assignment of a gasoline dealership which was established by a state law were two-pronged,

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

requiring that the franchisor first convince the court that its reasons for refusing to consent to a proposed assignment were rationally related to the franchise relationship, and second, that the franchisor's reasons are "of some substance." In drawing this conclusion, the *Gager* court reviewed the legislative intent underlying the statute and noted that the statute was enacted, in part, to "correct recognized historical abuses by petroleum industry franchisors." *Gager,* 547 F.Supp. at 859. The Court finds *Gager* inapposite here. Unlike *Gager* and many of the other cases presented by the Plaintiffs, *see, e.g., General Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 302 (3d Cir.2001) (considering whether termination of automobile franchise violated the ADDCA); *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358 (3d Cir.1992) (suit filed by unsuccessful franchise applicants and not seller of dealership); *Bronx Auto Mall, Inc. v. American Honda Motor Co., Inc.,* 934 F.Supp. 596, 597 (S.D.N.Y.1996) (seeking to enjoin manufacturer from terminating dealership), in the present case a dealer seeking to transfer a dealership complains that the transfer was not approved to the party that he had chosen. While the BVA and laws similar to it afford protection against the loss of significant financial investment in the dealership, *see Crivelli v. General Motors Corp.,* 215 F.3d 386, 390 (3d Cir.2000) (stating that underlying goal of statutes regulating dealer-manufacturer relationship is "to protect the franchisee who has invested substantial capital in the franchise and who is therefore vulnerable to a manufacturer who may take advantage of this firm-specific investment"), the Court does not believe that this is an analogous situation, particularly given the fact that the dealership in this case ultimately was transferred for the stated amount that the dealer (Staino) wanted to obtain and was accomplished within four months from the time that the dealer first stated his wish to sell it.

19    However, the Court notes that to the extent that the BVA imposes a standard of "fair dealing and honesty" between the parties, the analyses bear some practical similarity. See discussion at ¶¶ 15, 16, *supra.*

30. The Dealer Agreement between Staino and Volkswagen requires, among other things, that Volkswagen consider in good faith proposals for transfer of the dealership. *Ex.* D–3 at ¶ 12(1).

31. In determining the meaning of a term in a private agreement, a court must interpret the writing as a whole,

giving effect to all of its provisions. *Atlantic Richfield Co.,* 390 A.2d at 739. The term "good faith" is not specifically defined in the Dealer Agreement. However, a review of the provisions allowing for succeeding dealers outlined in the Dealer Agreement suggests that the parties intended a "good faith" review of a proposal to constitute a balance of rights between the distributor and the dealer. [20]

20    Under the Dealer Agreement, a distributor had the right to "approve the proposed transferees, the new owners and executives and, if different from [the dealer's], their premises." *Dealer Agreement,* Ex. D–220 at § 12(1). In turn, Volkswagen agreed to consider "in *good faith* any such proposal submitted during the term of the Agreement." *Id.* In determining whether the proposal would be acceptable to it, Volkswagen could take into account factors such as "the personal, business and financial qualifications of the proposed new owners and executives, as well as the proposal's effect on competition." *Id.*

32. As suggested above, in the context of franchise law, Pennsylvania courts have applied the standard for good faith set forth in Pennsylvania's Commercial Code, which requires that a party act with "honesty in fact" with respect to the conduct or transaction in question. 13 Pa.C.S.A. § 1201; *see also McCarthy v. Arnold Foods Co., Inc.,* 717 F.Supp. 325, 330 (E.D.Pa.1989) (assessing "good faith" in the context of the termination of a franchise by a franchisor); *Loos & Dilworth,* 500 A.2d at 1160 (adopting "honesty in fact in the conduct or transaction concerned" as definition of good faith with respect to franchises).

*17 33. Again, the Automobile Dealers Day in Court Act (the "ADDCA"), a federal statute allowing for recovery by a local automobile dealer if an automobile manufacturer coerced, intimidated or threatened an automobile dealer, defines good faith narrowly as "the duty of each party to any franchise ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation...." 15 U.S.C. § 1221(e); *see also General Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 304 (3d Cir.2001) (discussing definition of good faith under the ADDCA). [21]

21    The ADDCA is a federal law that protects only against breaches of good faith "evidenced by acts of coercion or intimidation." *See Northview Motors, Inc. v. Chrysler Motors Corp.,* 227 F.3d 78, 93 (3d Cir.2000). The Plaintiffs in this case do not assert a claim under the ADDCA, and the Court therefore

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

considers the definition of good faith under the ADDCA as precatory in the present context.

34. The Plaintiffs in this case have not presented sufficient evidence to establish that Volkswagen did not act in good faith in rejecting either the Asset Purchase Agreement or the Stock Purchase Agreement.

35. There was no breach of the good faith obligation defined in the Dealer Agreement because the evidence does not show that Volkswagen failed to behave honestly with respect to the proposed transaction. Volkswagen established at trial the following evidence that convinces the Court that it acted honestly with respect to its responses to the proposed transactions:
a. Testimony by Mr. Welsh that, after touring the West Chester Acura facility, he told Mr. Staino and the Piazza representatives that the physical facility would not be adequate to physically incorporate Mr. Staino's dealership. *W. Welsh, Nov. 10 Trans,* at 106:3–7.

b. Despite the acknowledged willingness of the Piazza Operations to agree to modify the facility, Volkswagen presented convincing evidence that its skepticism with respect to the proposed modifications within the time constraints presented by Mr. Staino was valid and well-grounded in reality, both as to prior Piazza performance and the specifics of the actual situation. For example, Volkswagen presented evidence that (1) Piazza Operations took nearly five years to modify its Ardmore facility, after agreeing to do so within 12 months, *see W. Welsh, Nov. 10 Trans.* at 154:23–25, 155–157; (2) Piazza Operations would have known that approvals with respect to the construction of the showroom would be needed, but did not even apply for a permit to construct the new facility until July of 1995, one month *after* the date on which the showroom was to have been constructed, *see R. Duncan, Nov. 15 Trans.* at 15:5–10; 17:6–25; 18:2225; 19:1–6; (3) the motel property adjacent to the Charlie Victor West Chester Acura facility that the Plaintiffs and Piazza personnel proposed would be cleared to allow for additional parking was not owned by the Piazza Operations, *see M. Weiss, Nov. 10 Trans,* at 251:11–22; (4) the adjacent property that was owned by the Piazza Operations was encumbered by a lease that included a long-term renewal provision; *M. Weiss, Nov. 10 Trans,* at 250:21–25; 251:1–10; and (5) the customer service scores for the Ardmore Volkswagen dealership, which were of demonstrable importance to Volkswagen, consistently fell below average. *W. Welsh, Nov. 15 Trans,* at 29:5–20.

Thus, the concerns Volkswagen had with respect to the degree of control that the Piazza would exercise over Staino Motors, if the Stock Purchase Agreement was consummated, as well as the skepticism that housing Staino Motors at the Piazza facility would be temporary until modifications were made, was not grounded on one single incident, but arose from a series of relevant disappointments in Volkswagen's past relationship with the Piazza Operations.

**\*18** 36. Volkswagen was not dishonest with Mr. Staino by rejecting the proposals and therefore did not breach its obligation to review proposals submitted to it in good faith. Volkswagen rejected the Asset Purchase Agreement by letter on April 12, 1997, after visiting the West Chester Acura facility and concluding that it was inadequate to support the unit volume of the Staino Motors and West Chester Acura dealerships. *See Ex.* D–4. After the Stock Purchase Agreement was submitted for approval by letter dated May 30, 1997, Volkswagen sent a letter dated June 12, 1997 to Mr. Staino's counsel explaining to him the reasons that the West Chester Acura facility and the Piazza were not an acceptable option for Volkswagen. *See Ex.* D–7; *Ex.* P–80.

37. There was also nothing dishonest or even insincere in Volkswagen's suggesting to Mr. Staino that he consider selling the dealership to Mr. Scott. Based on the evidence presented, this suggestion was at least as easily understood as an attempt to assist Mr. Staino to find an acceptable dealer rather than a conspiratorial attempt to keep Mr. Staino from realizing unprecedented profits by partnering with the Piazza.

38. In short, there was no evidence presented that persuades the Court to conclude that Volkswagen acted dishonestly in rejecting the Asset Purchase and Stock Purchase Agreements. Volkswagen candidly and promptly conveyed to Mr. Staino that it was unwilling to extend its existing relationship with the Piazza any further. In this regard, Volkswagen did not act in bad faith.

39. Because the evidence presented at trial does not demonstrate that Volkswagen acted in bad faith in rejecting the Asset Purchase and Stock Purchase Agreements, the Court finds in favor of Volkswagen with respect to the breach of contract claim.

Tortious Interference with Prospective Contractual Relations

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

40. Pennsylvania courts have adopted the Restatement (Second) of Torts definition of tortious interference, which requires improper conduct on the part of the tortfeasor for a finding of liability. *Crivelli v. General Motors Corp.,* 215 F.3d at 394.

41. The requisite elements to establish a claim for intentional interference with a contractual relation, whether existing or prospective, are: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Crivelli v. General Motors Corp.,* 215 F.3d 386, 394 (3d Cir.2000).

42. Where the agreement in question is not finalized, but is an agreement "in principle," the standard for liability is whether "[o]ne who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of ... preventing the other from acquiring or continuing the prospective relation." *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1381 (3d Cir.1992).

**\*19** 43. In determining whether a party's conduct rises to an actionable level of impropriety, there are a number of factors that may be considered, including the (1) nature of the actor's conduct; (2) actor's motive; (3) interests of the other with which the actor's conduct interferes; (4) interests sought to be advanced by the actor; (5) social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) proximity or remoteness of the actor's conduct to the interference; and (7) relations between the parties. RESTATEMENT (SECOND) OF TORTS § 767. Of these actions, the nature of the actor's conduct is a chief factor. *Crivelli,* 215 F.3d at 385.

44. There is no evidence supporting a claim for tortious interference in this case. As discussed *supra,* the actions taken by Volkswagen with respect to the Asset Purchase and Stock Purchase Agreements were neither unreasonable nor unfair. As such, the Court finds no basis for holding that Volkswagen tortiously interfered with

the Plaintiff's proposed agreements with Mr. Piazza. The Court therefore finds in favor of Volkswagen with respect to the claim for tortious interference with prospective contractual relations.

Damages

45. In view of the Court's conclusions, the issue of damages incurred by the Plaintiffs' need not be reached. However, the Court notes its grave doubts that Plaintiffs could have overcome case law regarding the requisite proof of damages.

46. In Pennsylvania, a plaintiff may recover lost profits in a contract action if (a) there is evidence to establish the loss with reasonable certainty; (b) they are the proximate cause of the lost profits; and (c) they are reasonably foreseeable. *Advent Systems Ltd. v. Unisys Corp.,* 925 F.2d 670, 680 (3d Cir.1991) (citing *Delahanty v. First Penna. Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1258 (Pa Super Ct.1983)). Inasmuch as the Staino Motors dealership was sold to Bellefair for the same price Mr. Staino had agreed to accept from Piazza/Charlie Victor four months earlier, it is difficult to accept Plaintiffs' contention with respect to lost profits. Although the Court acknowledges that Plaintiffs' alleged lost profits arose from the potential profits that could have been achieved had the Stock Purchase Agreement met with approval and if the resulting dealership was as successful as Staino energetically envisioned, the testimony by Plaintiffs' expert with respect to the potential profits was not convincing because the data used by the expert was simply not reliable enough to overcome the conventional case law criticism of overly speculative damages. For example, Jeffrey Kovacs, the independent expert who testified with respect to damages on behalf of the Plaintiffs, acknowledged that the estimated profits were themselves extrapolated from a compilation of financial projections, the underlying assumptions of which were established by the Plaintiffs. *J. Kovacs, Nov. 17 Trans.* at 54:25; 55:1–25. Mr. Kovacs also confirmed that none of the Staino projections and assumptions were reviewed by Mr. Kovacs or his firm. *J. Kovacs, Nov. 17 Trans.* at 58:9– 24.

**\*20** 47. Moreover, there was no evidence presented that Mr. Kovacs considered in any fashion whether the West Chester Acura facility was large enough to incorporate the Staino Volkswagen dealership, or whether any adjustments had been made to the financial projections to

Sabe Staino Motors, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d...

2005 WL 1041196

account for the interim period during which the necessary modifications to the dealership were to be completed. For these reasons, the Court finds that the evidence with respect to the Plaintiffs' alleged damages as a result of the rejection of the Stock Purchase Agreement is entirely too speculative to be viable even if the Staino liability claims could have been sustained.

*CONCLUSION*

For the reasons stated above, the Court finds that Plaintiffs have not met their burdens to prove Volkswagen liable on any of the counts of the Complaint, and a verdict should be entered in favor of Volkswagen as to each count. An appropriate Order follows.

*ORDER*

AND NOW, this 29th day of April, 2005, upon consideration of the evidence presented at the trial of this matter it is hereby ORDERED that judgment is ENTERED in favor of the Defendant, Volkswagen of America, Inc, and against Plaintiffs.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1041196

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

I, John B. Consevage, do hereby certify that the foregoing *Plaintiffs' Brief in Support of Motion For Reconsideration of the Court's Opinion and Order Granting Defendant's Motion to Dismiss Count III of Plaintiffs' Complaint* was electronically filed via the ECF system on the date set forth below, and therefore, made available to all counsel of record, as follows:

> Robert Hugh Ellis, Esquire
> Dykema Gossett PLLC
> 400 Renaissance Center
> Detroit, MI 48243
> Tel: (313) 568-6723
> REllis@Dykema.com
> *Attorneys for Defendant*

Dated: _2/19/19_

John B. Consevage, Esq
PA Atty. I.D. No. 36593
DILWORTH PAXSON LLP
Penn National Insurance Plaza
2 N. 2nd Street, Suite 1101
Harrisburg, PA 17101
Tel.: (717) 213-4105
Fax: (717) 236-7811
jconsevage@dilworthlaw.com
*Attorneys for Plaintiffs*