IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BROOKS AUTOMOTIVE GROUP, INC, *formerly known as* BROOKS OLDSMOBILE-CADILLAC-GMC TRUCK, INC., and B.L.P. REAL ESTATE, LLC | : : : : : | CIVIL ACTION NO.: 2:18-cv-00798-MJH |
| Plaintiffs, | : : | Hon. Marilyn J. Horan |
| v. | : : : | |
| GENERAL MOTORS LLC, | : : | |
| Defendant. | : | |

*DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243*

### GENERAL MOTORS LLC'S ANSWER TO FIRST AMENDED COMPLAINT

Defendant General Motors LLC ("GM"), by its attorneys, Dykema Gossett PLLC, responds to Plaintiffs' First Amended Complaint as follows:

### GENERAL DENIAL

GM denies each and every allegation of Plaintiffs' First Amended Complaint except as specifically admitted, answered, or otherwise qualified herein.

### PARTIES

1.     Plaintiff Brooks is a Pennsylvania corporation which at all times relevant to this litigation was engaged in business as a retail automobile dealership with a principal place of business located at 2401 Memorial Boulevard, Connellsville, Pennsylvania 15425.

**ANSWER:**     GM admits only that Brooks was formerly an authorized GM dealer for GM's Buick and GMC brands in Connellsville, Pennsylvania.  GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

2.      Plaintiff BLP Real Estate is a Pennsylvania limited liability company which owned the property located at 2401 Memorial Boulevard, Connellsville, Pennsylvania 15425.

**ANSWER:**   GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

3.      Defendant GM is a Delaware limited liability company engaged in business as a manufacturer and distributor of new automobiles, trucks and related products, with corporate offices located at 100 GM Renaissance Center, Detroit, Michigan 48265-1000.  GM is presently licensed by the Commonwealth of Pennsylvania as a manufacturer and distributor of new Cadillac, Buick, GMC Truck and Chevrolet vehicles and related products.

**ANSWER:**   GM admits that it is a Delaware limited liability company with its principal place of business in Detroit, Michigan.  GM also admits that it manufactures automobiles and is licensed to conduct business in Pennsylvania.  GM denies the remaining allegations in this paragraph as untrue.

## SUBSTANCE OF THE ACTION

4.      Plaintiffs bring this action against GM for its unlawful and improper conduct in its unreasonable and untimely denial of Brooks proposed sale of its Buick and GMC Truck dealership assets to Casey Harper and C. Harper Holdings, Inc. d/b/a as C. Harper Autogroup ("Harper Autogroup") and its subsequent unreasonable delay in considering Brooks' revised sales proposal.  GM's actions were in violation of multiple provisions of the Pennsylvania Board of Vehicles Act (63 P.S. § 818.1 *et. seq.)* (the "Act").  As a direct consequence of GM's unlawful acts and omissions, Plaintiffs have suffered monetary damages in excess of $1 million dollars. Plaintiffs seek direct and consequential monetary and compensatory damages against GM for its unlawful conduct.

**ANSWER:**    Denied as untrue.

## JURISDICTION

5.      This Court has diversity jurisdiction over the matters now brought before it pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

**ANSWER:**    GM admits only that this Court has subject matter jurisdiction over this dispute.  GM denies all allegations of wrongdoing and denies that Plaintiffs are entitled to any damages.

## VENUE

6.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391, in that it is where a substantial part of the events giving rise to Brooks' claims occurred and it is where the Brooks' Buick and GMC Trucks dealerships were located at the time of the events in question.

**ANSWER:**    GM admits only that venue is proper in this Court.  GM denies all allegations of wrongdoing and denies that Plaintiffs are entitled to any damages.

## FACTUAL BACKGROUND

7.      At all times relevant to Plaintiffs' claims, Brooks and GM were parties to a Dealer Sales and Service Agreement the terms of which were prepared by GM.  (A true and correct copy of the Brooks' 2015 GM Dealer Sales and Service Agreement with Standard Provisions is attached hereto at Exhibit "A".

**ANSWER:**    Exhibit A to the complaint speaks for itself.  GM denies the allegations in this paragraph inconsistent with Exhibit A.  GM otherwise admits that GM and Brooks were parties to a Dealer Sales and Services Agreement for GM's Buick and GMC brands (the "Dealer

Agreement"). GM denies that Exhibit A is complete copy of the Dealer Agreement. GM denies the remaining allegations in this paragraph.

8.    Article 2 of the Brooks' Dealer Agreement provides that the Dealer Agreement is a "Personal Services Agreement" entered into by GM in reliance upon the qualifications, integrity and reputation of the Dealer Operator identified in Paragraph Third of the Dealer Agreement.

**ANSWER:**    The Dealer Agreement speaks for itself. GM denies the allegations in this paragraph inconsistent with the Dealer Agreement.

9.    John Brooks served as the President of Brooks and the Dealer Operator under Paragraph Third of the Dealer Agreement with GM.

**ANSWER:**    GM admits only that John W. Brooks was the Dealer Operator. GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

10.    In 1985, GM contacted John Brooks and solicited him to open Oldsmobile and Cadillac dealerships in Connellsville, Pennsylvania. John Brooks accepted GM's invitation and opened GM Oldsmobile and Cadillac dealerships at 2401 Memorial Boulevard in Connellsville.

**ANSWER:**    GM admits that Brooks used to conduct dealership operations for Oldsmobile and Cadillac beginning in 1985. GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

11.    In 1996, Brooks Oldsmobile-Cadillac-GMC Truck, Inc. acquired the GM Pontiac, Buick and GMC Truck line-makes.

**ANSWER:**    GM admits that Brooks used to conduct dealership operations for Pontiac,

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

Buick, and GMC.  GM denies the remaining allegations in this paragraph.

12.    In order to accommodate these additional franchises and meet GM's facility requirements, Brooks moved its operations and dealership facilities from 2401 Memorial Boulevard to 1044 University Drive in Connellsville, Pennsylvania.

**ANSWER:**    GM admits that Brooks used to conduct dealership operations at 1044 University Drive in Connellsville, Pennsylvania.  GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

13.    In 2006, Brooks moved its franchises back to 2401 Memorial Boulevard into a newly constructed dealership facility that was then required by GM.

**ANSWER:**    GM admits that Brooks used to conduct dealership operations at 2401 Memorial Boulevard in Connellsville, Pennsylvania.  GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

14.    In 2009, at GM's direction, Brooks remodeled its dealership facility at 2401 Memorial Boulevard in Connellsville to meet all of GM's then-existing branding and operational facility requirements and to participate in GM's Essential Branding Elements ("EBE") program. Brooks continued to operate in this remodeled facility until September, 2017. (Attached as Exhibit "B" is a picture of the Brooks' facility at 2401 Memorial Boulevard in Connellsville ("the Brooks' Memorial Boulevard facility") as it existed in September 2017.)

**ANSWER:**    GM admits only that Brooks elected to participate in GM's EBE program, but GM denies that it required Brooks to participate in EBE or directed Brooks to do so. Answering further, GM states that Exhibit B to the complaint speaks for itself.  GM denies the remaining allegations in this paragraph.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

15.    On June 1, 2009, without prior notice to Brooks, GM's predecessor, General Motors Corporation, filed for bankruptcy.

**ANSWER:**    GM admits only that General Motors Corporation filed for bankruptcy. GM denies the remaining allegations in this paragraph.

16.    As part of the General Motors Corporation bankruptcy, GM elected to substantially reduce the number of its dealership franchises by shutting down its Pontiac, Saturn and Hummer line makes, selling its Saab line make and not assuming existing dealer agreements for a large number of Cadillac dealers.

**ANSWER:**    GM admits that Pontiac, Saturn, and Hummer were discontinued, that Saab was sold, and that certain dealers were not extended new dealer agreements in connection with General Motors Corporation's bankruptcy.    GM denies the remaining allegations in this paragraph.

17.    Thus, GM shut down its Pontiac line make and refused to assume Brooks' Cadillac dealer franchise agreement. Several years prior to the bankruptcy, in April of 2004, GM shut down its Oldsmobile line make.

**ANSWER:**    GM admits that Oldsmobile and Pontiac were discontinued.  GM also admits that it did not assume Brooks' dealer agreement for Cadillac.  GM denies the remaining allegations in this paragraph.

18.    The aforementioned decisions made by GM resulted in Brooks' loss of its Oldsmobile, Pontiac and Cadillac franchises.

**ANSWER:**    GM admits that Brooks used to conduct dealership operations for Oldsmobile, Pontiac, and Cadillac.  GM denies the remaining allegations in this paragraph.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

19.    Accordingly, beginning in 2010 and continuing thereafter, Brooks was left with only its Buick and GMC Truck franchises to operate from its recently constructed and newly remodeled Memorial Boulevard facility.

**ANSWER:**    GM admits that from 2010 to 2017, Brooks conducted dealership operations for Buick and GMC.  GM denies the remaining allegations in this paragraph.

20.    In June of 2015, Brooks contacted GM and requested that it be permitted to add a Chevrolet franchise at its Memorial Boulevard facility.

**ANSWER:**    GM admits that Brooks expressed interest in Chevrolet in 2015.  GM denies the remaining allegations in this paragraph.

21.    GM rejected Brooks' request claiming that there was insufficient market demand in Connellsville to support a new Chevrolet dealership, even though Chevrolet's biggest domestic competitor — Ford Motor Company ("Ford") was operating an adjacent Ford dealership that sold between 500-600 new Ford vehicles in 2015-2016.

**ANSWER:**    GM admits only that it declined Brooks' request for Chevrolet.  GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations about Ford.  GM denies the remaining allegations in this paragraph.

22.    On July 23, 2015, Brooks Oldsmobile-Cadillac-GMC Truck, Inc. amended its Articles of Incorporation and changed its name to Brooks Automotive, Inc.

**ANSWER:**    GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

23.    During the same 2015-2016 time period, GM, through its captive finance company — Ally Bank, materially changed the floor plan terms on Brooks' loaner vehicles.

7

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

**ANSWER:**    GM denies that Ally Bank is its captive finance company and denies that GM has any control over terms proposed by Ally Bank.   GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

24.    Concurrently, and as noted above, GM was promoting its EBE program through which GM represented that Brooks could finance its 2009 remodeling construction costs at its Memorial Boulevard facility.  Through EBE, GM was offering to pay and/or credit its dealers $500 per each new GM vehicle ordered by and delivered to an EBE compliant dealer. EBE compliance included a remodeled facility that met GM's then existing requirements. Brooks remodeled its Memorial Boulevard facility to become EBE compliant and to become eligible for the above-described EBE payments.

**ANSWER:**    The EBE guidelines speak for themselves.   GM denies the allegations inconsistent with the EBE guidelines.  GM denies the remaining allegations in this paragraph.

25.    However, GM did not fairly allocate to Brooks a sufficient number of "high demand/"high-selling" vehicles, thereby negatively impacting Brooks' ability to order and sell more vehicles under GM's "turn and earn" allocation system. By the end of 2015, Brooks' allocation of GM vehicles had diminished by approximately $1.8 million and its EBE payment money had been reduced by approximately forty percent (40%).

**ANSWER:**    Denied as untrue.

26.    Notwithstanding Brooks' 30-year business relationship with GM, GM's acts and omissions had the cumulative effect of forcing Brooks into an unsustainable financial condition in which it would be forced to sell its GM franchise dealerships.

**ANSWER:**    Denied as untrue.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

27.    On August 22, 2016, John Brooks met with GM representatives Regional Director — Regis Buckley, II ("Buckley"), Buick/GMC Truck Zone Manager — Steven Burns and Buick/GMC Truck Dealer Rep — Michael Lewis, who told John Brooks that Brooks needed to "quit writing letters" requesting the addition of a Chevrolet franchise at Brooks' Memorial Boulevard facility because GM was not going to approve any such request. The GM representatives also told John Brooks that Brooks could sell its Buick and GMC Trucks franchise assets separately to rectify Brooks' financial condition.

**ANSWER:**    GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

A.    **Proposed Sale of Brooks' Buick and GMC Trucks assets.**

28.    Based upon GM's statements and representations at the August 2016 meeting, Brooks began exploring the potential sale of the Brooks' Buick and GMC Trucks dealership assets to potential buyers.

**ANSWER:**    GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

29.    Brooks subsequently began negotiations with Casey Harper, another GM dealer principal operating in Belle Vernon, Pennsylvania through the entity known as C. Harper Holdings, Inc. d/b/a Harper Autogroup ("Harper Autogroup").  At the time, Harper Autogroup owned and operated several GM dealership line-makes, including Chevrolet, Buick and Cadillac at a large campus facility located at 100 Harper Drive, Route 51, Belle Vernon, Pennsylvania (the "Harper Autoplex").

**ANSWER:**    GM admits only that Harper Autogroup owned and operated certain GM brand dealerships.  GM lacks knowledge or information sufficient to form a belief as to the truth

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

of the remaining allegations in this paragraph

30.      In the fall of 2016, Brooks and Harper Autogroup came to an agreement wherein Harper Autogroup would purchase the Brooks' Buick and GMC Truck dealership franchise assets. As part of the purchase, Harper Autogroup planned to effectively close/consolidate the Brooks' Buick franchise with its existing Buick franchise in Belle Vernon and relocate the GMC Truck franchise to the Harper Autoplex.

**ANSWER:**    GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

31.      After closing on the sale of the dealership assets to Harper Autogroup, BLP Real Estate planned to sell its dealership facility in Connellsville to an unrelated third-party. During late 2016, the first half of 2017, BLP Real Estate had been discussing the sale of the Brooks' Memorial Boulevard dealership facility to potential third party buyer for a purchase price of $1.3 million.

**ANSWER:**    GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

32.      On November 17, 2016, John Brooks, Brooks, Casey Harper and Harper Autogroup entered into a written Asset Purchase Agreement (copy attached hereto as Exhibit "C") (the "November 2016 APA").  Harper Autogroup agreed to purchase all of Brooks' new vehicles and new parts inventory.  In addition, Harper Autogroup agreed to purchase the goodwill value of the Brooks' Buick and GMC Trucks dealership franchises for a total purchase price of $750,000.

**ANSWER:**    Exhibit C to the complaint speaks for itself.  GM denies the allegations in

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

this paragraph inconsistent with Exhibit C.  GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

33.     As required by Brooks' Dealer Agreement with GM, closing on the sale was conditioned upon GM's approval of Casey Harper and Harper Autogroup, and GM's approval of the relocation of the GMC Truck dealership to the Harper Autoplex.

**ANSWER:**     Exhibit C to the complaint speaks for itself.  GM denies the allegations in this paragraph inconsistent with Exhibit C.  GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

34.     Brooks notified GM of the proposed sale to Harper Autogroup and submitted the November 2016 APA to GM for approval on or about November 18-19, 2016.

**ANSWER:**     GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

35.     Per GM's request, Brooks subsequently submitted a dated copy of the APA on December 15, 2016 and all required forms with respect to GM's consideration of the proposed sale to Harper Autogroup on January 9 and 12, 2017.

**ANSWER:**     GM admits only that Brooks provided a copy of the signed APA on or about December 15, 2016.  GM denies the remaining allegations in this paragraph as untrue.

36.     On January 27, 2017, GM advised Brooks that no additional information was needed from Brooks relative to its consideration of the proposed sale to the Harper Autogroup.

**ANSWER:**     Denied as untrue.

37.     Casey Harper and Harper Autogroup initiated their application process by

11

notifying GM of the proposed asset sale on December 15, 2016.

**ANSWER:**    Denied as untrue.

38.    Casey Harper and Harper Autogroup submitted and completed the initial GM Questionnaire application form on January 5, 2017 via facsimile to GM's designated representative — Wannetta Perkins-Hill ("Perkins-Hill"). (A copy of the initial Questionnaire From and facsimile to GM dated January 5, 2017 is attached hereto as part of Exhibit "D".)

**ANSWER:**    Exhibit D to the complaint speaks for itself.  GM denies the allegations in this paragraph inconsistent with Exhibit D.    GM denies the remaining allegations in this paragraph as untrue.

39.    GM responded by providing Casey Harper with a candidate user name and password to access the GM Global Connect System on January 12, 2017.

**ANSWER:**    Denied as untrue.

40.    On January 20, 2017, Harper Autogroup notified GM that it had completed all of the electronic application forms up to the sales and profit forecast necessary to prepare the pro forma balance sheet.

**ANSWER:**    Denied as untrue.

41.    Upon information and belief, by January 26, 2017, Harper Autogroup had submitted to GM its Sales and Profit Forecast necessary for the preparation of the Pro Forma Balance Sheet. Thus, all of the information requested by GM was submitted to GM by Harper Autogroup on or before January 26, 2017.

**ANSWER:**    Denied as untrue.

12

42.    Over the course of the next several weeks, GM made multiple requests to Casey Harper and/or Harper Autogroup for additional information relative to GM's application and approval process, including a criminal background check of its existing dealer principal, Casey Harper. All requested information was provided to GM.

**ANSWER:**    GM admits only that there were communications concerning the status of the forms generally utilized by GM and containing the information required by GM.  GM denies that any such requests were requests for additional information.   GM denies that all the forms required by GM and containing the information required by GM were received prior to March 1, 2018.  GM denies any remaining allegations in this paragraph.

43.    Many of these requests involved information that GM had and/or should have had in its possession as Harper Autogroup was an existing GM Chevrolet, Buick and Cadillac dealer and Casey Harper was the dealer principal for each of these GM franchises. Similarly, all of Harper Autogroup's historical financial and performance information was known and/or readily accessible to GM.

**ANSWER:**    GM admits only that Harper Autogroup was an existing GM dealer and Casey Harper was a dealer operator.  GM denies the remaining allegations in this paragraph.

44.    During this same period, Brooks contacted GM on multiple occasions to inquire as to the status of GM's approval process.  Brooks advised GM that as word of the proposed sale had become known, it was losing customers and key employees, and had little inventory to sell. Thus, Brooks' monthly operating losses were mounting significantly.

**ANSWER:**    GM admits only that Brooks and GM communicated.  GM denies any liability to Brooks, denies any allegations of wrongdoing, and denies any responsibility for alleged "monthly operating losses."  GM lacks knowledge or information sufficient to form a

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

belief as to the truth of the remaining allegations in this paragraph.

**B.**    **GM's Denial of the November 2017 APA.**

45.    On April 19, 2017, GM issued a letter to John Brooks and Brooks, with copies to Harper Autogroup denying the proposed sale as represented in the November 2016 APA ("April 19th denial letter"). (A true and correct copy of GM's April 19th denial letter is attached hereto as Exhibit "E".)

**ANSWER:**    Exhibit E to the complaint speaks for itself. GM denies the allegations in this paragraph inconsistent with Exhibit E.

46.    In its April 19th denial letter, GM set forth the specific reasons on which it allegedly based its decision to deny the proposed sale.

**ANSWER:**    Exhibit E to the complaint speaks for itself. GM denies the allegations in this paragraph inconsistent with Exhibit E.

47.    More particularly, GM stated that it had analyzed the proposal and its impact on the Pittsburgh area GMC Truck dealer network and found that it was "not acceptable to GM". GM further represented that the proposal was "not in the best interest of GM's customers, the GMC brand, or the GMC dealer network" based upon the following factors relating to the proposed relocation of the Brooks' GMC Truck franchise to the Harper Autoplex:

(a)    GM was allegedly concerned that the proposed relocation "may negatively" impact the five (5) existing Pittsburgh GMC Truck dealers' ability to achieve a reasonable rate of return on their dealership investments.

(b)    GM was allegedly concerned about the declining population in and around Pittsburgh.

(c)     GM stated that the existing GMC Truck dealerships were providing adequate competition as reflected by performance in the GMC Truck Retail Registration Index.

(d)     GM stated that the proposed relocation would have a negative impact on the existing GMC Truck dealer network because (i) the proposed relocation would not provide for exclusive representation of GMC Truck at the Harper Autoplex; (ii) the proposed relocation would result in the addition of a GMC Truck dealer point into the Pittsburgh Multi Dealer Area ("MDA"); and (iii) the proposed relocation would likely injure the existing GMC Truck customers and dealer network by increasing the distance customers would have to travel for GMC Truck sales and service.

(e)     GM was also allegedly concerned that Harper Autogroup's proposed sales forecast of GMC Truck was too high.

**ANSWER:**    Exhibit E to the complaint speaks for itself.  GM denies the allegations in this paragraph inconsistent with Exhibit E.

48.    On June 6, 2017, Casey Harper and Harper Autogroup, through their attorneys — James Davis, Esquire, requested that GM reconsider its decision to deny the proposed sale based upon their GM dealership history of exemplary performance and other information that contradicted GM's reasoning as set forth in the April 19th denial letter.

**ANSWER:**    GM admits that it received correspondence dated June 6, 2017, from James Davis, Esquire, which correspondence speaks for itself.  GM denies the allegations in this paragraph inconsistent with that correspondence.

49.    GM responded by letter dated June 14, 2017, and reiterated that GM did not

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

object to the proposed buyer — Harper Autogroup, but only to the proposed relocation of the Brooks' GMC Truck dealership to the Harper Autoplex in Belle Vernon.  (A true and correct copy of GM's letter of June 14, 2017 is attached hereto has Exhibit "F".)

**ANSWER:**    Exhibit F to the complaint speaks for itself.  GM denies the allegations in this paragraph inconsistent with Exhibit F.

50.    Although they vehemently disagreed with GM's decision, given GM's June 14th response and Brooks' continuing, ongoing and increasing operating losses, Brooks and Harper Autogroup agreed to enter into a revised agreement for the sale of the Brooks' Buick and GMC Truck dealership assets.

**ANSWER:**    GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

51.    On June 27, 2017, John Brooks, Brooks, Casey Harper and Harper Autogroup entered into a new and revised Asset Purchase Agreement for the sale of the Brooks dealership assets (the "June 2017 APA"). (A true and correct copy of the June 2017 APA is attached hereto as Exhibit "G".)

**ANSWER:**    Exhibit G to the complaint speaks for itself.  GM denies the allegations in this paragraph inconsistent with Exhibit G.

52.    The substantive terms of the November 2016 APA and the June 2017 APA were very similar with two material exceptions:  (i) the June 2017 APA no longer contemplated the relocation of the Brooks' dealership assets to the Harper Autoplex; and (ii) the purchase price for the goodwill value of the Brooks' Buick and GMC Truck dealerships was reduced from $750,000 to $600,000.

**ANSWER:**   Exhibits F and G to the complaint speak for themselves.  GM denies the allegations in this paragraph inconsistent with Exhibits F and G.

53.   In order to come to an agreement on the June 2017 APA, BLP Real Estate, a limited liability company which held legal title to the Memorial Boulevard facility and the property on which it sits (hereinafter the "Memorial Boulevard Property"), entered into a Sales Agreement for the sale of the Memorial Boulevard Property to Casey Harper and C. Harper Holdings, Inc. and/or its successors and assigns ("Harper Holdings") on June 30, 2017 (the "Real Estate Sales Agreement"). (A true and correct copy of the Real Estate Sales Agreement is attached hereto as Exhibit "H").

**ANSWER:**   Exhibit H to the complaint speaks for itself.  GM denies the allegations in this paragraph inconsistent with Exhibit H.  GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

54.   Through the Real Estate Sales Agreement, BLP Real Estate agreed to sell the Memorial Boulevard Property to Harper Holdings. Upon closing, it was intended that Harper Holdings would lease the Memorial Boulevard Property to Harper Autogroup so it could operate the Buick and GMC Truck dealerships at their then existing location. The purchase price to be paid by Harper Holdings to BLP Real Estate for the Memorial Boulevard Property was One Million Dollars ($1,000,000.00).

**ANSWER:**   Exhibit H to the complaint speaks for itself.  GM denies the allegations in this paragraph inconsistent with Exhibit H.  GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

55.   In order to move forward with the June 2017 APA, Brooks and Harper Autogroup

once again sought GM's approval.

**ANSWER:**    Admitted.

56.    The June 2017 APA was forwarded to GM on the date it was signed — June 27, 2017.

**ANSWER:**    GM admits that it received the June 2017 APA on June 27, 2017.  GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

57.    On July 11, 2017, GM, through its designated representative — Perkins-Hill, emailed the required forms to Brooks for signature on behalf of Brooks and Harper Autogroup. The forms were signed and returned to GM on the same day — July 11, 2017.

**ANSWER:**    GM admits only that Ms. Perkins-Hill sent Brooks correspondence on July 11, 2017, which speaks for itself.  GM denies the allegations in this paragraph inconsistent with that correspondence.  GM denies the remaining allegations in this paragraph as untrue.

58.    On July 12, 2017, Brooks contacted Perkins-Hill and was advised that GM was in receipt of the forms but that Casey Harper and Harper Autogroup would have to re-submit all of the other GM application forms, including a second criminal background check authorization for Casey Harper, financials and a sales forecast as though no prior proposal had ever been submitted.  Perkins-Hill told Brooks that the process could take up to another 90 days.

**ANSWER:**    GM admits only that its review of the June 2017 APA required Brooks and Harper Autogroup to submit information and documents.  GM denies the remaining allegations in this paragraph as untrue.

59.    John Brooks again contacted GM's Regional Director for the Northeast Region —

Buckley and requested that the process be expedited in view of the fact that Casey Harper was an existing dealer who had just recently submitted the same information to the apparent satisfaction of GM. Brooks reiterated to GM its concerns about the increasing operating losses being caused by GM's delays.

**ANSWER:** GM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

60.    Through July and August, Brooks continued to press GM for a decision explaining that the delay was unreasonable in view of the fact that through its June 14th letter, GM had effectively stated that Harper was qualified and approvable and that the June 2017 APA no longer contemplated a relocation of the Brooks' Buick and GMC Truck dealerships to the Harper Autoplex. Instead, the dealerships would continue to operate at the Memorial Boulevard Property.

**ANSWER:** The June 2017 APA speaks for itself. GM denies the allegations in this paragraph inconsistent with the June 2017 APA. GM denies the remaining allegations in this paragraph.

61.    Finally, on September 5, 2017, 70 days after the June 2017 APA was submitted to it, GM approved the revised dealership sales proposal.

**ANSWER:** GM admits only that it approved the June 2017 APA proposal in written correspondence dated September 5, 2017, which speaks for itself. GM denies the remaining allegations in this paragraph as untrue.

62.    On October 23, 2017, Brooks closed on the sale of its Buick and GMC Truck dealership assets to C. Harper Buick — GMC Inc. as the assignee of Harper

Autogroup. BLP Real Estate also closed on the sale of the Memorial Boulevard Property to Harper Holdings.

**ANSWER:**    GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

### NEGATIVE IMPACT ON BROOKS AND BLP REAL ESTATE

63.    Beginning with the August 2016 meeting, Brooks advised GM through its regional director — Buckley, that it was financially untenable for Brooks to continue to operate its Buick and GMC Truck franchises at the Memorial Boulevard Property without the addition of the Chevrolet line-make.

**ANSWER:**    GM admits only that Brooks expressed interest in Chevrolet.  GM denies the remaining allegations in this paragraph.

64.    GM refused Brooks' request and essentially directed Brooks to sell its franchises.

**ANSWER:**    GM admits only that it declined Brooks' request for Chevrolet.  GM denies the remaining allegations in this paragraph as untrue.

65.    Brooks then sought out potential buyers and entered into negotiations with Casey Harper and Harper Autogroup, an existing GM Buick, Cadillac and Chevrolet dealer with an exemplary performance record.

**ANSWER:**    GM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

66.    When presented with the November 2016 APA, GM materially delayed its processing of Brooks' request for consent to sell its dealership assets to Harper Autogroup by

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

treating Casey Harper and Harper Autogroup as unknown persons and entities.

**ANSWER:**    Denied as untrue.

67.    More particularly, GM took 141 days from its receipt of the November 2016 APA from Brooks and 104 days from its receipt of the initial application form from Casey Harper and Harper Autogroup on January 5, 2017 to issue its April 19, 2017 denial letter. Alternatively, GM's April 19, 2017 denial letter was issued at least 81 days after GM's receipt on or before January 26, 2017, of all of the initial information requested from Casey Harper and Harper Autogroup.

**ANSWER:**    Denied as untrue.

68.    In addition, the alleged reasons for denial set forth in GM's April 19th denial letter were unreasonable, arbitrary and capricious.

**ANSWER:**    Denied as untrue.

69.    Contrary to GM's statements in its April 19th denial letter, the proposed relocation of the Brooks' GMC Truck dealership to the Harper Autoplex was within the Brooks' then assigned area of responsibility under Brooks' dealer franchise agreement with GM and would not have negatively impacted the GM's existing dealer network and/or its customers.

**ANSWER:**    Denied as untrue.

70.    A relocation is by definition, a change in the location of a dealership. Thus, every relocation results in some consumers being somewhat inconvenienced by the move, while others will be closer to the new site and therefore become beneficiaries of the move. The appropriate question for GM's consideration was whether the proposed relocation negatively impacted a materially greater number of consumers than it benefited; and/or stated another way, whether the

relocation resulted in a material inconvenience to the average consumer.

**ANSWER:**   Denied as untrue.

71.    GM failed to present any market analysis or study to Brooks or Harper Autogroup to justify its denial. Upon information and belief, Brooks believes that no independent and/or complete market study was ever performed by or on behalf of GM prior to issuance of the April 19th denial letter.

**ANSWER:**   Denied as untrue.

72.    The proposed sale to Harper Autogroup through the November 2016 APA would not have changed the total number of GMC Truck dealers in the Pittsburgh market area, and would have in fact reduced the total number of Buick dealers in the Pittsburgh market area.

**ANSWER:**   Denied as untrue.

73.    Thus, GM offered no evidence to support its conclusion that the relocation of Brooks' GM Truck dealership from Connellsville to Belle Vernon would have negatively impacted the other five (5) existing GMC Truck dealers' ability to earn a reasonable rate of return on their dealership investments.

**ANSWER:**   Denied as untrue.

74.    A general reference to the declining population in and around Pittsburgh was completely inadequate to support GM's April 19th denial letter without a thorough market study that would have included a detailed examination and complete market study of the population trends in and around Connellsville, Belle Vernon and the other areas within the relevant market area.

**ANSWER:**   Denied as untrue.

75.    Similarly, GM's reliance on its own geographically defined MDA was misplaced, arbitrary and capricious. As noted above, the proposed sale to Harper Autogroup would not have increased the total number of GMC Truck dealers in the Pittsburgh metro market. GM created the geographical boundaries of the Pittsburgh MDA. Thus, if Connellsville was not within the MDA, GM could have easily excluded Belle Vernon from it. In this regard, GM could have simply re-drawn or modified its MDA geographical boundary lines to exclude Belle Vernon. More importantly, the MDA is an artificial boundary created by GM in its arbitrary discretion. It does not impact the practical reality that there were six (6) GMC Truck dealers competing in the Pittsburgh market area before the proposed sale to Harper Autogroup and that there would have been 6 GMC Truck dealers competing in the Pittsburgh market area after closing on the proposed sale to the Harper Autogroup had GM approved the November 2016 APA. In addition, the number of Buick dealers competing in the Pittsburgh market area would have been reduced.

**ANSWER:**    Denied as untrue.

76.    GM's reliance on the fact that GMC Truck would not have been located in an exclusive facility is not relevant or appropriate to GM's denial of the proposed sale. Brooks' GMC Truck dealership was not operated in an exclusive facility and other Pittsburgh area GMC Truck dealers do not operate in exclusive facilities. Pennsylvania law also prohibits GM from insisting on exclusive dealer facilities that cannot be supported by existing market conditions or justified by business considerations. *See* 63 P.S. § 818.12(a)(6).

**ANSWER:**    The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies the remaining allegations in this paragraph.

77.    Finally, GM's attempted reliance on the Harper Autogroup's forecast of sales as

being "too-high" is absurd, arbitrary and capricious without a thorough and complete market study. Had GM advised Harper Autogroup that its sales forecast was "too high," it could have simply amended and reduced it. Moreover, upon information and belief, Harper Autogroup's sales forecast was generated in large part by the information provided to it by GM.

**ANSWER:**    Denied as untrue.

## **PLAINTIFF'S DAMAGES**

78.    As a direct and consequential result of GM's improper and unlawful acts and omissions in violating Sections 12(b)(3) and 12(b)(5) of the Act, Plaintiffs have suffered the following monetary damages:

(a)    Brooks lost $150,000 on the sale of the goodwill (blue sky) value of its Buick and GMC Truck dealerships to Harper Autogroup;

(b)    Brooks lost in excess of $850,000 as a direct result of GM's actions in denying the proposed sale to Harper Autogroup through the November 2016 APA and its further delay in processing the June 2017 APA. More particularly, GM's unlawful delay and denial of the proposed sale of the Brooks' dealership assets to Harper Autogroup forced Brooks to continue to operate its Buick and GMC Truck franchises for an approximate additional 7-month time period when it was losing customers, key employees and had inadequate vehicle inventory to sell. Based upon the financial statements submitted by Brooks to GM during the period January through October 2017, Brooks lost $852,983 that it could have avoided had GM had not violated Section 12(b)(3) and (5) of the Act in untimely and unreasonably denying the proposed sale to Harper Autogroup through the November 2016 APA. In order to stay open and not be terminated during that

period, Brooks was forced to borrow in excess of $700,000 to keep operating its

GM dealership franchises, which it never recouped. Brooks also suffered other

additional and consequential damages which will be established and quantified at

trial. (A copy of Brooks' GM Financial Statement for the period January through

October 2017, is attached hereto as Exhibit "I"); and

(c)    BLP Real Estate lost $300,000 on the sale of the Memorial Boulevard Property.

**ANSWER:**    Denied as untrue.

## PENNSYLVANIA BOARD OF VEHICLES ACT

79.    The Pennsylvania Board of Vehicles Act, 63 P.S. § 818.1 *et. seq.,* (hereinafter the

"BVA") was enacted to level the playing field and regulate the relationship between vehicle

manufacturers and dealers.

**ANSWER:**    The referenced law speaks for itself.  GM denies the allegations in this

paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by

GM and denies the remaining allegations in this paragraph.


80.    Section 29 of the BVA, expressly provides that "any person" who is or may be

injured by a violation of a provision of the BVA, may bring an action for damages and equitable

relief in any court of competent jurisdiction. 63 P.S. § 818.29.

**ANSWER:**    The referenced law speaks for itself.  GM denies the allegations in this

paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by

GM and denies the remaining allegations in this paragraph.


81.    Section 12(b)(5) of the Pennsylvania Board of Vehicles Act (63 P.S. §

818.12(b)(5)) makes it unlawful for any manufacturer and/or distributor to fail to respond in

writing to any request for consent to the sale of a franchise within sixty (60) days of receipt of a written request, on the forms, if any, generally utilized by the manufacturer or distributor for such purposes and containing the information required. 63 P.S. § 818.12(b)(5).

**ANSWER:**    The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph.

82.    Although Section 12(b)(5) of the Act provides that this time period may be extended by an additional 15 days if supplemental information is requested within 15 days of the manufacturer's receipt of the initial farms, the statute expressly provides that in "[n]o event shall the total time period for approval exceed 75 days from the date of the [manufacturer's] receipt of the initial forms." 63 P.S. § 818.12(b)(5).

**ANSWER:**    The referenced law speaks for itself.  GM denies the allegations in this paragraph to the extent they are inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph.

83.    Section 12(b)(3) of the Act provides that it shall be unlawful for a manufacturer to "unreasonably withhold consent to the sale ... of the franchise to a qualified buyer capable of being licensed as a new vehicle dealer "who meets the manufacturer's or distributor's reasonable requirements for appointment as dealer." 63 P.S. § 818.12(b)(3).

**ANSWER:**    The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph as untrue.

84.    The terms "unreasonable" or "reasonable" as utilized by the BVA have been

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

interpreted by Pennsylvania courts to mean that the manufacturer must act in good faith and in a commercially reasonable and honest manner with respect to the transaction at issue. Decisions that are outcome driven and/or based on contrived or bad faith reasons are unreasonable and unlawful under Section 12(b)(3) of the Act.

**ANSWER:**   The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph as untrue.

85.   Thus, Section 12(b)(3) of the Act prohibits a manufacturer from denying a request for approval of a dealer's sale of its dealership assets based upon contrived, manipulated and/or unfounded reasons that are not made in good faith.

**ANSWER:**   The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph as untrue.

86.   Section 11(a) of the Act requires that a dealer serve a written demand for mediation before or contemporaneous with the timing of the filing of any complaint or legal action. 63 P.S. § 818.11(a).

**ANSWER:**   The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph.

87.   In this case, Brooks served a written demand for mediation upon GM on June 13, 2018.  (A true and correct copy of Brooks' letter is attached hereto as Exhibit "I".)  Mediation has been conducted by the parties pursuant to this Court's ADR process.

27

**ANSWER:**   GM admits only that Brooks served a written demand for mediation, and the parties conducted mediation pursuant to this Court's ADR process.  GM denies the remaining allegations in this paragraph.

**COUNT I**
**(Violation of Section 12(b)(5) of the BVA)**

88.   Plaintiffs hereby incorporate by reference the averments in Paragraphs 1 through 87 of the Amended Complaint, *supra,* as if each and all said averments were fully set forth herein.

**ANSWER:**   GM incorporates by reference its responses to all prior paragraphs.

89.   Section 12(b)(5) of the Pennsylvania Board of Vehicles Act (63 P.S. § 818.12(b)(5)) makes it unlawful for GM to fail to respond in writing to any request for consent to the sale of a franchise within sixty (60) days of receipt of a written request, on the forms, if any, generally utilized by it for such purposes and containing the information required. 63 P.S. § 818.12(b)(5).

**ANSWER:**   The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph.

90.   Although Section 12(b)(5) of the Act provides that this time period may be extended by an additional 15 days if supplemental information is requested within 15 days of the manufacturer's receipt of the initial forms, it expressly states that in no event shall the time period for approval exceed 75 days from GM's receipt of the initial application forms. 63 P.S. § 818.12(b)(5).

**ANSWER:**   The referenced law speaks for itself.  GM denies the allegations in this

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph.

91.    Section 12(b)(5) of the Act further provides, in relevant part, that a failure by GM to respond within the time periods set forth, therein, *shall be* deemed to be approval of the request. 63 P.S. § 818.12(b)(5).

**ANSWER:**    The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph.

92.    Here, Brooks submitted the November 2016 APA to GM on or about November 18-19, 2016, and provided all forms required by GM by no later than January 12, 2017.

**ANSWER:**    Denied as untrue.

93.    Casey Harper and Harper Autogroup submitted and GM received the initial application questionnaire form on January 5, 2017.

**ANSWER:**    GM admits only that certain information and documents were received on January 5, 2017, but GM denies that all information and documents that GM required from Mr. Harper and/or Harper Autogroup were received by that date.  GM denies the remaining allegations in this paragraph.

94.    Casey Harper and Harper Autogroup subsequently submitted to GM all of the initial forms additional forms and information on or before January 26, 2017.

**ANSWER:**    Denied as untrue.

95.    Thus, under Section 12(b)(5), GM had until March 21, 2017 (75 days from the

date of its receipt of the initial forms from Casey Harper and Harper Autogroup on January 5, 2017) to approve or deny the proposed sale as contemplated by the November 2016 APA. Alternatively, even if the January 26, 2017 date is utilized, GM's response was due on or before April 11, 2017 (75 days from January 26, 2017).

    **ANSWER:**    Denied as untrue.

96.    GM did not act on the proposed sale until it issued its April 19th denial letter on April 19, 2017.

    **ANSWER:**    GM admits that it issued its decision concerning the November 2016 APA on April 19, 2017. GM denies the remaining allegations in this paragraph.

97.    GM's April 19th denial letter was untimely under the requirements of the BVA, and therefore in violation of Section 12(b)(5) of the Act.

    **ANSWER:**    Denied as untrue.

98.    Brooks and BLP Real Estate have each suffered direct and consequential monetary damages in excess of $75,000 as a result of GM's violation of Section 12(b)(5) of the BVA. *See* 63 P.S. § 818.29.

    **ANSWER:**    Denied as untrue.

    WHEREFORE, GM requests that the Court grant relief in its favor and against Plaintiff, including dismissal with prejudice of all claims and the award of costs and attorney fees in GM's favor, as well as such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT II
### (Violation of Section 12(b)(3) of the BVA)

99.    Plaintiffs hereby incorporate by reference the averments contained in Paragraphs 1 through 98 of the Amended Complaint, *supra,* as if each and all said averments were fully set forth herein.

**ANSWER:**    GM incorporates by reference its response to all prior paragraphs.

100.    Section 12(b)(3) of the Act makes it unlawful for GM to unreasonably withhold consent to the sale of the Brooks' Buick and GMC Trucks franchises to a qualified buyer capable of being licensed in the Commonwealth of Pennsylvania, who meets the reasonable requirements of GM.

**ANSWER:**    The referenced law speaks for itself.  GM denies the allegations in this paragraph inconsistent with the referenced law.  GM denies any allegations of wrongdoing by GM and denies the remaining allegations in this paragraph.

101.    At all times relevant to the instant claims, Harper Autogroup was a qualified buyer capable of being licensed as a new GMC Truck and Buick dealer in the Commonwealth of Pennsylvania.

**ANSWER:**    Denied as untrue.

102.    Casey Harper and Harper Autogroup, along with the Harper Autoplex, met all of Defendants' reasonable requirements for owning and/or operating the Brooks' franchises at issue.

**ANSWER:**    GM admits only that, as set forth in GM's correspondence dated September 5, 2017, it approved C. Harper Buick GMC Inc. for a new dealer agreement in connection with the June 2017 APA.  GM denies the remaining allegations in this paragraph.

103.    GM's April 19th denial letter constituted an unreasonable denial of the proposed

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

31

sale of the Brooks' Buick and GMC Truck dealership assets to Harper Autogroup, by reason of the fact that the grounds set forth in April 19th denial letter were manipulated, contrived and not made in good faith.

**ANSWER:**    Denied as untrue.

104.    Plaintiffs have suffered direct and consequential monetary damages in excess of $75,000 as a result of GM's unlawful acts and omissions in violation of Section 12(b)(3) of the BVA. *See* 63 P.S. § 818.29.

**ANSWER:**    Denied as untrue.

WHEREFORE, GM requests that the Court grant relief in its favor and against Plaintiff, including dismissal with prejudice of all claims and the award of costs and attorney fees in GM's favor, as well as such other and further relief as the Court may deem appropriate under the circumstances.

## AFFIRMATIVE AND OTHER DEFENSES

GM has not yet had an opportunity to conduct an extensive investigation or discovery into Plaintiffs' claims and, therefore, relies upon the following defenses:

1.    Plaintiffs' complaint fails to state a claim against GM upon which relief can be granted.

2.    B.L.P. Real Estate is not a party to the contract with GM, does not have standing to assert any claims, and is not a proper party.

3.    Plaintiffs' claims are barred in whole or in part by Plaintiffs' failure to mitigate their damages.

4.    Plaintiffs' claims are barred by the existence of written contracts.

5.    Plaintiffs' waived their claims, if any, under 63 P.S. § 818.12(b)(5) by executing and closing on the June 2017 APA.  The statute does not permit monetary damages, and this Court cannot grant the relief contemplated under that statute.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

6.   Plaintiffs cannot articulate any damages caused by any purported delay.

7.   Plaintiffs' claims are precluded by their own unclean hands.

8.   Plaintiffs' claims are barred, in whole or in part, by set-off.

9.   Plaintiffs' claims are precluded by the statute of frauds and statute of repose.

10.  There is no causal connection between any action or inaction of GM and Plaintiffs' claimed damages.

11.  Plaintiffs' claims are barred or limited to the extent the alleged damages were caused by their own conduct.

12.  Plaintiffs' claims are barred in whole or in part by the statute of frauds, waiver, estoppel, laches, claim preclusion, and res judicata.

## **RESERVATION OF RIGHTS**

GM reserves its rights to amend this Answer, to add affirmative defenses, and to assert counterclaims against Plaintiff and claims against any appropriate party.

Respectfully submitted,

**DYKEMA GOSSETT PLLC**

By:/s/ Robert Hugh Ellis
Robert Hugh Ellis, Esq.
MI. I.D. No. P72320
WI I.D. No. 1057332
400 Renaissance Center
Detroit, MI  48243
(313) 568-6723
rellis@dykema.com
*Attorneys for General Motors LLC*

Dated:  March 5, 2019

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN  48243

## **CERTIFICATE OF SERVICE**

I do hereby certify that on March 5, 2019, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which sends notification to all counsel of record.

*/s/ Robert H. Ellis*
Robert H. Ellis, Esq.
*Attorneys for Defendant General Motors LLC*

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243